248 P.3d 1085 (2011)
The ERECTION COMPANY, INC., Appellant,
v.
DEPARTMENT OF LABOR AND INDUSTRIES of the State of Washington, Respondent.
No. 28844-7-III.
Court of Appeals of Washington, Division 3.
February 22, 2011.
*1087 David E. Chawes, Preg, O'Donnell & Gillett PLLC, Mark F. O'Donnell, Preg O'Donnell et al., Seattle, WA, for Appellant.
Masako Kanazawa, Attorney at Law, Seattle, WA, for Respondent.
SIDDOWAY, J.
¶ 1 In July 2006 an employee of The Erection Company Inc. (TEC) installing roof decking at a Quincy, Washington, construction site was killed when the bundle of decking material to which he had affixed his safety lanyard fell from the roof structure. TEC appeals penalties imposed for safety violations following an investigation by the Department of Labor and Industries; it contends that it could not have foreseen that its employee would attach his safety lanyard to moving material and neither the evidence nor the law supports the Board of Industrial Insurance Appeals' conclusion that it had constructive knowledge of a dangerous condition. It also challenges the enhancement of two penalties as repeat violations.
¶ 2 While there is no evidence that TEC had actual knowledge of its employees' hazardous practice, substantial evidence supports the board's conclusion, affirmed by the superior court, that it could, with reasonable diligence, have known of the hazard created by its unusual practice of installing safety lines on moveable material. We find no legal error in the board's application of the constructive knowledge standard and substantial evidence supports the board's factual findings. We therefore affirm.

*1088 FACTS AND PROCEDURAL BACKGROUND
¶ 3 TEC is a steel erection subcontractor. In 2006, it began work on a data center being constructed by Microsoft Corporation in Quincy, Washington. Part of TEC's work on the project involved securing sheets of metal decking across the top of the building at a height of around 30 feet. The steel roof decking material came in bundles weighing between 2,000 and 3,000 pounds. Cranes would land the decking material bundles on the rooftop trusses so that the workers could lay them out and secure them to the beams.
¶ 4 Because of the dangers of working at such heights, TEC installed safety lines made of three-eighths inch aircraft cable, called "catenary lines," to which the workers attached themselves. Primary catenary lines were attached to the structural members prior to erection, running the full length of each beam, and a high line, safety cable guardrail system was installed. TEC also attached catenary lines to each bundle of decking material.
¶ 5 Two weeks before the accident, a Department of Labor and Industries compliance and safety and health officer, Tim McMinn, inspected the project site, reviewed TEC's accident prevention and fall protection plans, and found no violations. At the time, the building had no roof. McMinn later testified that he could not recall seeing any catenary lines attached to decking material bundles during that inspection.
¶ 6 On the day of the accident, Travis Watts and Brian Pitts, both journeymen ironworkers, were securing metal decking. In order to make their work easier, the two decided to relocate a bundle of decking material that was in their way, which is a common practice referred to as "endoing." They moved the bundle using a "come-along," a ratchet system used to move heavy loads. Watts connected the come-along to the bundle and to a beam and operated the come-along. Pitts watched to see when the bundle had been securely relocated. After the bundle had been moved to a point where it spanned three beams, one in the middle and one on each end, Pitts called to Watts that the location was good. Watts released the come-along, at which point the bundle moved a bit moreenough to come off the beam providing support at one end. The bundle teetered and fell. Watts, who had secured his safety lanyard to the bundle, fell with the bundle to his death.
¶ 7 As a result of the accident, the department began an investigation that resulted in a citation against TEC for violations of the fall restraint/arrest system standard, fall protection plan requirement and other safety regulations. Two violations were charged as repeat violations based on a prior "repeat serious" violation of the fall restraint and fall arrest system requirement at WAC 296-155-24510. The department assessed a total penalty of $10,500.
¶ 8 TEC contested the citation. Following a three-day hearing, the industrial appeals judge (IAJ) issued a proposed decision and order vacating three of the four citation items. The department petitioned the Board of Industrial Insurance Appeals to review the decision. The board granted review, reversed the decision of the IAJ, and affirmed the original citation in full. The superior court affirmed the board's decision and TEC timely appealed.
¶ 9 TEC raises four issues on appeal: (1) the board applied an erroneous standard of law in finding that TEC knew, "should have known," or through the exercise of reasonable diligence could have known about the alleged violative conditions; (2) there is no substantial evidence supporting the board's finding of fact 5 that TEC had constructive knowledge that its employees were tying off to bundles that were being moved; (3) the department failed to present evidence that TEC had constructive knowledge that its fall protection plan and accident prevention plan were deficient; and (4) there is no substantial evidence that TEC's prior citations relied upon for a repeat violation penalty were for violations of the same or substantially similar hazards as alleged in the citation.

ANALYSIS
¶ 10 The legislature enacted the Washington Industrial Safety and Health Act of 1973 (WISHA) "to assure, insofar as may *1089 reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington." RCW 49.17.010. The Department of Labor and Industries is charged with promulgating regulations under WISHA, RCW 49.17.040, and employers are responsible for complying with these regulations in their oversight of all employees. Express Constr. Co. v. Dep't of Labor & Indus., 151 Wash.App. 589, 596, 215 P.3d 951 (2009). When the department charges an employer with a WISHA violation, the department bears the initial burden of proving the violation occurred. Id. at 597, 215 P.3d 951.

STANDARD OF REVIEW
¶ 11 WISHA governs judicial review of decisions issued by the Board of Industrial Insurance Appeals. RCW 49.17.140, .150(1). We review a decision by the board directly, based on the record before the agency. Legacy Roofing, Inc. v. Dep't of Labor & Indus., 129 Wash.App. 356, 363, 119 P.3d 366 (2005).
¶ 12 We review the board's interpretation of statutes and regulations de novo, Prezant Assocs., Inc. v. Dep't of Labor & Indus., 141 Wash.App. 1, 7, 165 P.3d 12 (2007), but give substantial weight to an agency's interpretation of a regulation within its area of expertise, Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 119 Wash. App. 906, 913, 83 P.3d 1012 (2004). WISHA statutes and regulations are to be interpreted liberally in order to achieve their purpose of providing safe working conditions for every worker in Washington. Inland Foundry Co. v. Dep't of Labor & Indus., 106 Wash. App. 333, 336, 24 P.3d 424 (2001).
¶ 13 The findings of the board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, are conclusive. RCW 49.17.150(1). Substantial evidence is evidence that would persuade a fair-minded person of the truth or correctness of the matter. King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 553, 14 P.3d 133 (2000); Danzer v. Dep't of Labor & Indus., 104 Wash.App. 307, 319, 16 P.3d 35 (2000), review denied, 143 Wash.2d 1020, 25 P.3d 1019 (2001). We view the evidence and its reasonable inferences in the light most favorable to the prevailing partyhere, the departmentin the highest forum that exercised fact-finding authorityhere, the board. See Johnson v. Dep't of Health, 133 Wash. App. 403, 411, 136 P.3d 760 (2006). We then review whether the findings of fact support the conclusions of law. Prezant, 141 Wash. App. at 7, 165 P.3d 12 (citing RCW 49.17.150; Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus., 136 Wash.App. 1, 4, 146 P.3d 1212 (2006)).
BOARD CONCLUSION REGARDING WHAT TEC "SHOULD HAVE KNOWN"
¶ 14 RCW 49.17.180(2) directs that any employer receiving a citation for a "serious" violation "shall be assessed a civil penalty." A "serious violation" is one where there is a "substantial probability that death or serious physical harm could result" from the violation. RCW 49.17.180(6); Lee Cook Trucking & Logging v. Dep't of Labor & Indus., 109 Wash.App. 471, 482, 36 P.3d 558 (2001). Among the elements that the department must show in order to establish a prima facie case of a "serious violation" is that the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition. RCW 49.17.180(6); SuperValu, Inc. v. Dep't of Labor & Indus., 158 Wash.2d 422, 433, 144 P.3d 1160 (2006). In challenging the board's findings of "serious" violations, TEC challenges only the board's finding 5: that TEC "knew, should have known, or through the exercise of reasonable diligence could have known" of the violative practice of employees tying off to unsecured lines. Clerk's Papers (CP) at 23 (emphasis added).
¶ 15 TEC contends that the board's finding that it "should have known" of the violative practice applies an erroneous legal standard, contrasting that finding with WISHA, whose standard for constructive knowledge is that a violative condition exists and "the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." RCW 49.17.180(6) (emphasis added). It argues that the board's reliance on a standard that includes an unauthorized "should have known" component created an *1090 avenue by which the board could more easily find constructive knowledge and that it suffered prejudice as a result. Appellant's Reply Br. at 7-8. In arguing that a "should have known" standard made it easier for the board to find a violation it focuses on the word "should" and argues that, as a past tense of "shall," it creates a mandatory duty, whereas the statute uses the word "could," a past tense of "can," which creates no such duty. Appellant's Br. at 14-15.
¶ 16 More than a few WISHA cases have used the phrase "should have known" when referencing the "could have known" language originating in RCW 49.17.180(6), albeit without any discussion as to whether the two phrases are properly interchangeable. J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus., 139 Wash.App. 35, 46, 156 P.3d 250 (2007) (finding that "substantial evidence supports a determination that J.E. Dunn should have known, with the exercise of reasonable diligence, of the violations alleged"); Centimark Corp. v. Dep't of Labor & Indus., 129 Wash. App. 368, 371, 119 P.3d 865 (2005) (concluding that "[b]ecause ... Centimark should have known of the current violative condition, [the board] did not err in classifying the violations as `serious'"); Wash. Cedar & Supply, 119 Wash.App. at 916, 83 P.3d 1012 (finding that it would "not disturb the Board's conclusion that the employer should have been aware of the violation").
¶ 17 At least one federal court has engaged in a similar interchanging of words when ruling on a comparable Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. §§ 651-678, case.[1]Austin Bldg. Co. v. Occupational Safety & Health Review Comm'n, 647 F.2d 1063, 1068 (10th Cir.1981) ("We believe the evidence was sufficient to permit the administrative law judge to find that ... the company knew or could have known, with the exercise of reasonable diligence by the inspection of the foreman, that this hazardous practice exists." "A diligent foreman checking the safety of his workers should have discovered the hazardous conduct." (Emphasis added.)).
¶ 18 Each of these state and federal cases employ the statutory "could have known" language elsewhere in the decision, just as the board's decision in this case sets forth the statutory standard precisely in stating the requirements of a prima facie case before it adds the "should have known" language in finding 5. CP at 23.
¶ 19 "Should have known" is not the standard as articulated by the legislature, but we do not read an occasional use of that expression as indicating that a standard other than the statutory standard has been employed. Contrary to TEC's position that "should" creates a mandatory duty by virtue of being the past tense of "shall," the word has different meanings, and is used in an auxiliary function to express "propriety," or "what is expected." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2104 (1993) (definitions 2 and 5). Particularly in inferring legal obligations, "should" cannot be read to mean "shall." See State v. Barron, 139 Wash.App. 266, 275, 160 P.3d 1077 (2007) ("Clearly, `should' is not `shall.'"). In the context of the board's finding and case law discussing an employer's duties under WISHA and OSHA, we read the word "should" to have a normative meaning corresponding with the employer's duty under the applicable law: in other words, if the law imposes responsibility when the employer "could ... with the exercise of reasonable diligence, know" of a riskand it is shown that the employer could, with the exercise of reasonable diligence have known of a particular riskthen the employer "should" know of that particular risk. Thus read, the board's finding (in part) that TEC "should have known" of the violation does not add to or subtract from the board's finding that TEC's conduct met the statutorily prescribed standard of fault.
¶ 20 Even if the board was not using the terms interchangeably and, in using "should have known," had some different, heightened *1091 standard in mind, we may still affirm its decision so long as substantial evidence supports the decision under the correct statutory standard. Cf. Chandler v. Office of Ins. Comm'r, 141 Wash.App. 639, 660, 173 P.3d 275 (2007) (concluding that "[w]e do not need to decide whether the review judge properly adopted a heightened standard of care because substantial evidence supports her decision under the statutory duty of care"), review denied, 163 Wash.2d 1056, 187 P.3d 751 (2008). If substantial evidence in the record supports a finding that TEC could have known of the condition through the exercise of reasonable diligencean issue we discuss belowthen any error arising from the board's finding that TEC "should have known" of the violation was harmless.

SUFFICIENCY OF EVIDENCE THAT TEC HAD CONSTRUCTIVE KNOWLEDGE THAT EMPLOYEES TIED OFF TO UNSECURED CATENARY LINES
¶ 21 One of the "serious" violations charged by the department and affirmed by the board was of the fall restraint/arrest system requirement provided at WAC 296-155-24510. That regulation provides, in part, as follows:
When employees are exposed to a hazard of falling from a location ten feet or more in height, the employer shall ensure that fall restraint, fall arrest systems or positioning device systems are provided, installed, and implemented according to the following requirements:
[Graphics omitted]
(1) Fall restraint protection shall consist of:
(a) Standard guardrails as described in chapter 296-155 WAC, Part K.
(b) Safety belts and/or harness attached to securely rigged restraint lines.
TEC does not dispute that Mr. Watts' practice of tying off to the catenary line on the bundle he was moving created an unsecured fall restraint anchorage violating subsection (1)(b). But it does challenge the sufficiency of the evidence to support the board's determination in finding 5 that it had constructive knowledge of the violative condition, thereby making the violation a "serious" one. Finding 5 reads in its entirety:
On July 25, 2006, [TEC] knew, should have known, or through the exercise of reasonable diligence could have known, that the act of moving the roofing/decking bundle created an unsecured anchorage; and knew, should have known, or through the exercise of reasonable diligence could have known, that its employees occasionally attached fall protection lanyards to the decking material bundle while in the process of moving or "endoing" the bundle.
CP at 23.
¶ 22 The parties agree that the department did not prove that TEC had actual knowledge that its ironworkers occasionally attached safety lanyards to the decking bundles while moving them. The department claims to have established only that TEC had constructive knowledge.
¶ 23 "`Reasonable diligence involves several factors, including an employer's obligation to inspect the work area, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence.'" Kokosing Constr. Co. v. Occupational Safety & Hazard Review Comm'n, 232 Fed.Appx. 510, 512 (6th Cir. 2007) (internal quotation marks omitted) (quoting Sec'y of Labor v. Pride Oil Well Serv., 15 O.S.H. Cas. (BNA) 1809, 1820, 1992 O.S.H. Dec. (CCH) ¶ 29807). Constructive knowledge of a violative condition may be demonstrated by the department in a number of ways, including evidence showing that the violative condition was readily observable or in a conspicuous location in the area of the employer's crews. BD Roofing, Inc. v. Dep't of Labor & Indus., 139 Wash.App. 98, 109, 161 P.3d 387 (2007) (citing Sec'y of Labor v. Kokosing Constr. Co., 17 O.S.H. Cas. (BNA) 1869, 1871-72, 1995-1996 O.S.H. Dec. (CCH) ¶ 31207); see also Austin Bldg. Co., 647 F.2d at 1068 (concluding that the employee welding in a precarious spot was easily observable and a diligent foreman checking the safety of his workers should have discovered the hazardous conduct). Evidence of a record of similar prior citations may also substantiate such a finding. Wash. Cedar & Supply, 119 Wash.App. at 916, 83 P.3d 1012.
*1092 ¶ 24 TEC argues that Mr. Watts was not easily viewed from below, particularly when he was kneeling on a bundle of deck material, as was the case at the time of the accident. It argues that he could have tied off his safety lanyard to at least three other catenary lines attached to stable parts of the structure, and that his coworker, Mr. Pitts, had tied himself off to a secure catenary line. It insists that for Mr. Watts to have tied himself to a load he was moving was "a completely unexpected action that no one, including the inspector, had ever heard of happening before."[2] Appellant's Br. at 20. When viewed in the light most favorable to the department, however, the record contains substantial evidence that TEC could, with reasonable diligence, have learned or anticipated that its employees occasionally engaged in the hazardous practice of tying off to insecure or moving bundles.
¶ 25 TEC does not dispute the board's finding that it attached catenary lines to bundles of decking material and understood that its employees might use the catenary lines attached to the bundles as a connection point for fall protection. CP at 23 (Finding of Fact 4). Unchallenged findings of fact are verities on appeal. Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 808, 828 P.2d 549 (1992). This was an apparently unique practice, given that the bundles could be moved. Mr. Pitts had never seen catenary lines on deck bundles in his seven years of decking experience until joining TEC for the Quincy project. By providing catenary lines on the bundles, TEC invited its workers to tie off to them for fall protection. Mr. Pitts testified that it was "pretty common" for workers to tie off to a bundle.
¶ 26 TEC knew that the bundles were commonly moved by its ironworkers. Tim Hettich, TEC's field superintendent and manager at the Quincy job site, testified that come-alongs were provided and were commonly used by the ironworkers to reposition bundles on the roof. Mr. Pitts testified that he would endo about two or three out of every five bundles.
¶ 27 TEC knew that bundles of decking material were not secure even when not in motion. Mr. Hettich testified that the steel structure does not become stable until the diaphragm of the deck is fully pinned down, and if a column were hit by material or equipment during construction, the building could rock a few inches. The location to which the accident bundle was moved by Mr. Watts and Mr. Pitts, although perceived as safe by them (because they moved it from a location where it spanned two beams to a location where it spanned three) was actually hazardous. At a length of 22 feet 2 inches the deck spanned three beams with 10-foot and 12-foot bays between the beams, meaning it extended by only inches over the beams on either end. Mr. Hettich testified that if a backhoe or forklift bumped a column and the building shifted, there was a "good chance" a bundle thus positioned would come down.
¶ 28 From these facts, TEC, if reasonably diligent, could have anticipated that a worker might tie off to a bundle that would become a "live load," advertently or otherwise. Mr. Watts tied off to a live load on the date of the accident and Mr. Pitts testified that he had previously tied off to the catenary line on a bundle while moving it as well. Yet TEC, whose written fall protection work plan included a 100 percent tie-off requirement, failed to caution against or limit workers' practice of tying off on the catenary lines attached to the bundles.
¶ 29 The parties agree that the ironworkers' practice of endoing bundles occurred in plain view, as did their actions in tying off to catenary lines on bundles. Darrin Nelson, an employee of the general contractor and the site's project safety director, was concerned after observing ironworkers tying off on catenary lines on successive bundles as they traversed across the rooftop. Nelson notified TEC's Hettich, who was on the site daily, about his concern about the ironworkers' tying off to bundles, since he had never seen that practice.
*1093 ¶ 30 These facts are sufficient to persuade a fair-minded person that TEC could, with reasonable diligence, have known that its workers might tie off to the catenary line on an insecure bundle, including one being moved. Substantial evidence supports the challenged finding.

SUFFICIENCY OF EVIDENCE THAT TEC KNEW OR COULD HAVE KNOWN OF DEFICIENCIES IN ITS FALL PROTECTION AND ACCIDENT PREVENTION PLANS
¶ 31 TEC next contends that there was no substantial evidence it had constructive knowledge that its fall protection work plan and accident prevention program were deficient, assigning error to findings 8 and 9.
¶ 32 WAC 296-155-24505 provides, in part:
(1) The employer shall develop and implement a written fall protection work plan including each area of the work place where the employees are assigned and where fall hazards of 10 feet or more exist.
(2) The fall protection work plan shall:
(a) Identify all fall hazards in the work area.
(b) Describe the method of fall arrest or fall restraint to be provided.
¶ 33 WAC 296-155-110(2) provides:
Each employer shall develop a formal accident-prevention program, tailored to the needs of the particular plant or operation and to the type of hazard involved. The department may be contacted for assistance in developing appropriate programs.
The board's findings 8 and 9 state, respectively, that on July 25, 2006, TEC's fall protection work plan "did not address either the pre-installed roofing/decking bundle catenary lines, or the potential use of those lines while the bundle was in the process of being moved or `endoed,'" CP at 9 (Finding of Fact 8), and TEC "failed to develop a formal accident-prevention program, tailored to the needs of the particular plant or operation and to the type of hazard involved." Id. (Finding of Fact 9). Here again, TEC does not contest the finding of a violation of WAC 296-155-24505, but only that it committed a "serious" violation because it had constructive knowledge that its safety plans were deficient in these respects.
¶ 34 TEC's challenge to the sufficiency of the evidence to support its constructive knowledge of deficiencies in its safety plan and program parallels its challenge to the finding of a fall arrest violation: since nothing in the record establishes that tying off to a moving load is a known construction hazard, it argues, it cannot be responsible for warning its employees about it. Appellant's Reply Br. at 16-19. Of course there was no evidence in the record that others in the construction industry attach catenary lines to moveable bundles of decking material provided for work taking place at 30-foot heights. And nothing in WAC 296-155-24505 or WAC 296-155-110(2) requires that a fall hazard be known from experience or have a history of occurring. WAC 296-155-24505 requires employers to identify "all fall hazards in the work area," not all "known construction hazards" in the work area.
¶ 35 A safety plan need not identify "every possible accident that could ever occur," as TEC claims the department now requires of it, but it must warn of hazardous conduct that the employer could reasonably anticipate. Appellant's Reply Br. at 19. We have already reviewed the substantial evidence supporting TEC's constructive knowledge that its employees might tie off to moving or otherwise insecure bundles. TEC not only concedes that it would be hazardous for a worker to tie off to a moving or poorly placed bundle, it views the hazard as very clear. Yet it included a 100 percent tie-off requirement in its fall protection plan without making any distinction between use of catenary lines on bundles and other catenary lines. Its fall protection plan and accident program did not address the fall hazard associated with use of catenary lines on a bundle that was being endoed or was otherwise insecure. It follows necessarily from the facts that (1) TEC could have known that its workers might tie off to moving bundles and (2) its acknowledgment of the associated hazard, that TEC could have known in the exercise of reasonable diligence that its safety plan and program were deficient. Accordingly, there is substantial evidence to support a *1094 serious violation of the accident plan and fall protection plan requirements.[3]

SUFFICIENCY OF EVIDENCE TO SUPPORT THE BOARD'S REPEAT VIOLATION CONCLUSION
¶ 36 Under RCW 49.17.180(1), the department may assess enhanced penalties when an employer willfully or repeatedly violates a safety or health standard promulgated under the authority of WISHA. Under WAC 296-900-14020, an employer may be charged with a repeat violation and its penalty increased "[w]hen the employer has been previously cited for a substantially similar hazard, with a final order for the previous violation dated no more than 3 years prior to the employer committing the violation being cited." In such cases, the base penalty may be "[m]ultiplied by the total number of citations with violations involving similar hazards, including the current inspection." WAC 296-900-14020.
¶ 37 In this case, the department charged TEC with repeat violations of WAC 296-155-24510 (the fall arrest and restraint requirement) and WAC 296-155-24505 (the accident prevention plan requirement) based on a final order entered in May 2004 affirming a citation for violating WAC 296-155-24510. At the initial hearing, the IAJ requested evidence in support of the department's request for an enhanced penalty based on a repeat violation and the department offered Mr. McMinn's testimony as to his review of TEC's regulatory history, which TEC objected to on hearsay and foundation grounds. In response, the IAJ stated that she had a copy of the prior final order (In re Erection Company, Inc., No. 02 W0078, 2004 WL 1900982 (Wash. Bd. of Indus. Ins. Appeals May 3, 2004)) and offered, absent objection, to take judicial notice of the findings and conclusions under ER 201 for purposes of the repeat violation issue. TEC did not object. When the IAJ later found no serious violations of WAC 296-155-24510 and WAC 296-155-24505, she had no need to analyze whether there were repeat violations.
¶ 38 When the board reinstated the citations, the issue of whether they were repeat violations was revived; the board concluded that the violations of WAC 296-155-24510 and WAC 296-155-24505 were repeat violations.
¶ 39 TEC does not dispute that it committed a previous fall restraint and arrest system violation or that the final order pertaining to the prior violation was entered within three years of its present violations. Appellant's Br. at 33-34. Its argues only that because the record does not establish what hazardous conduct was involved in its one prior violation, the board had an insufficient basis for making the required determination that the same or a substantially similar hazard was involved in the current violations, and that it is accordingly entitled to a recalculation of the penalty, removing the enhancement.
¶ 40 In Cobra Roofing Services, Inc. v. Department of Labor & Industries, 157 Wash.2d 90, 94, 135 P.3d 913 (2006) the department issued WISHA citations under WAC 296-155-24510 after observing that three employees working on a roof were not wearing fall protection equipment or otherwise protected by a fall restraint system. The department doubled the fall protection penalty as a repeat violation, in light of a prior citation of Cobra for violating WAC 296-155-24510. Cobra Roofing, 157 Wash.2d at 94, 135 P.3d 913. The record in Cobra Roofing gave no specific details of the nature of the previous violation or the conduct giving rise to that citation. Id.[4]
*1095 ¶ 41 Cobra Roofing made the same argument that TEC makes here, although under a slightly different regulatory definition of "repeat violation"; at the time the penalty was imposed in Cobra Roofing, former WAC 296-27-160001(9) (1996) defined a "`repeat violation'" as "`any violation of a standard or order when a violation has previously been cited to the same employer when it identifies the same type of hazard.'" Id. (emphasis added). Cobra Roofing argued that the statute authorizing enhanced penalties for repeat violations should be read to require a repeat of the specific conduct supporting the violationin its case, the specific violative equipment or practicenot merely a violation of the same regulation, which, in the case of the fall protection regulation, is broad. A majority of the court disagreed, reasoning that "WISHA unambiguously defines `repeat' with respect to the nature of the hazard and requires the government to prove only that the violations involve the same type of hazard, not the same underlying conduct." Id. at 98, 135 P.3d 913. It noted that regardless of whether Cobra's prior violation involved a different particular subsection under the code, "Cobra employees were exposed to the hazard of falling from a height of 10 feet or more because they lacked adequate fall protection." Id.
¶ 42 The applicable regulation now, and at the time of TEC's violations, provides that a repeat violation occurs when an employer has previously been cited for "a substantially similar hazard." WAC 296-900-14020. There is no indication that the change in the description of a repeat violation was intended to be substantive. See Wash. St. Reg. XX-XX-XXX (describing this and other amendments to the penalty provisions as having been intended to "increase public awareness and lessen confusion surrounding penalties"); cf. Cobra, 157 Wash.2d at 104 n. 7, 135 P.3d 913 (Chambers, J., dissenting) (characterizing the change as a "slightly different articulation of what constitutes a repeat violation," not affecting his analysis).
¶ 43 The 2004 final order against TEC was judicially noticed by the IAJ without objection and was therefore properly considered by the board. TEC was found by the 2004 order to have exposed employees on two occasions to a greater than 10-foot fall hazard where they were not appropriately secured by lanyard or protected by an active monitor system. 2004 WL 1900982 at *6. The board found in the 2004 order that TEC "failed to ensure that all employees were protected from falls up to 60 feet by ensuring when necessary 100 percent tie off of the employees at the [subject] worksite." Id. at *12 (Finding of Fact 5). The board concluded in the 2004 order that TEC committed a serious violation of WAC 296-155-24510. Id. at *13 (Conclusion of Law 3).
¶ 44 Applying the requirement that the department demonstrate "the same type of hazard, not the same underlying conduct," and that Cobra identified "falling from a height of 10 feet or more because an employee lacks adequate fall protection" as a type of hazard that can arise from a variety of violative conduct, the board's findings of fact support its conclusion that TEC's violations of WAC 296-155-24510 and WAC 296-155-24505 were repeat violations.
¶ 45 We affirm the board's decision and order.
WE CONCUR: SWEENEY and BROWN, JJ.
NOTES
[1] When reviewing Washington statutes that share their purpose with a federal counterpart, we may look to federal decisions to determine the appropriate construction of the statute in question. Lee Cook Trucking, 109 Wash.App. at 478, 36 P.3d 558. We may consider relevant federal decisions interpreting OSHA when interpreting WISHA. RCW 49.17.050(2); Inland Foundry, 106 Wash.App. at 336, 24 P.3d 424.
[2] The employer's affirmative defense of "unpreventable employee misconduct" is not at issue here. See RCW 49.17.120(5)(a). TEC disclaimed reliance on it, CP at 543, and did not present evidence of its elements.
[3] TEC briefly argues that the department should be estopped from asserting TEC's knowledge or constructive knowledge of deficiencies in its safety plans because the department reviewed them and found them compliant two weeks before the accident. It does not seriously develop the argument or discuss any of the five elements that must be proved to estop a state agency. See Kramarevcky v. Dep't of Soc. & Health Servs., 122 Wash.2d 738, 743-44, 863 P.2d 535 (1993). The department argues that the estoppel claim fails on all of the required elements. Resp't's Br. at 36. We need not consider undeveloped arguments and arguments without authority. RAP 10.3(a)(6); State v. Dennison, 115 Wash.2d 609, 629, 801 P.2d 193 (1990).
[4] The department asks us not to consider TEC's challenge to the board's finding of a "repeat" violation of WAC 296-155-24505, arguing that it failed to raise that challenge in the superior court. The board had imposed no monetary penalty for the violation of WAC 296-155-24505, so the finding had no financial impact. We deem it sufficiently raised before the board, whose record we consider on review.