IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISON ONE

| | |
|---|---|
| SEFNCO COMMUNICATIONS, INC., | No. 82376-1-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| WASHINGTON STATE DEPARTMENT OF LABOR & INDUSTRIES, | |
| Respondent. | |

COBURN, J. — SEFNCO Communications, Inc. (SEFNCO) hired LaborMax flaggers for a mobile operation stringing telecommunication lines. SEFNCO was cited for violating the Washington Industrial Safety and Health Act (WISHA) when one of the flaggers was observed standing near the middle of a two-way road as traffic approached. SEFNCO appeals denying that it is a joint employer subject to liability. It also challenges whether the flagger committed the violations and whether the violations qualified as repeat serious violations. We affirm.

FACTS

In April 2018, SEFNCO contracted with LaborMax[1] to provide flaggers to perform traffic control while SEFNCO's aerial crew performed a mobile work

_____

[1] Anytime Labor Seattle, doing business as LaborMax, was the primary employer of the flaggers. The primary employer also was cited for violations but is not a party to this appeal.

Citations and pin cites are based on the Westlaw online version of the cited material

operation in Federal Way to string telecommunication lines. The aerial crew, who themselves were certified flaggers, included one person in a bucket working on the power lines and two people on the ground. SEFNCO submitted work permit documents for the project, including a site specific traffic control plan (TCP). SEFNCO sent the TCP to LaborMax and expected flaggers to comply with the TCP. If the SEFNCO employees determined that the flaggers were not complying with the TCP, they would stop working or would not begin work. The site specific TCP depicts anticipated locations of flaggers.[2]

SEFNCO did not equip LaborMax flaggers or set their wages. Further, SEFNCO could not fire LaborMax flaggers. However, SEFNCO retained the right to stop all work if flaggers were not acting safely. According to SEFNCO's safety manual, the foreman conducts a tailgate safety meeting at all job sites, including subcontractors, and is responsible for completing a job site safety analysis and documenting any safety hazards on the tailgate safety form immediately upon arriving at each job site. The safety manual also states, "The supervisor/foreman will secure all work areas with properly posted traffic signs to warn the public of any hazards and to ensure all workers are working in a safe environment[.] Traffic Control Plan is to be followed according to the contract or local, state and federal jurisdiction." On April 3, 2018, SEFNCO's on-site

---

[2] The record only has pages one and two of a four-page "Site Specific Traffic Control Plan." The specific area where the violation occurred, along Military Road South near 306th Street in Federal Way, is not depicted in the two pages in the record but was admitted below. The record does include a Google map where an "X" marks the spot where the inspector saw the violation.

foreman was Luis Legaspi.[3]  Prior to starting work, Legaspi held the tailgate safety meeting, which included the two LaborMax flaggers.  Legaspi handed the flaggers a copy of the TCP and made sure they had on all of their personal protective equipment (PPE).  Legaspi showed the flaggers the job site and showed them where they would be setting their traffic signs.  The flaggers were about 50 to 100 feet from the truck with the aerial crew.  Once the truck made its way into the road, two flaggers then controlled traffic so the SEFNCO crew could conduct its work stringing fiber on the telecommunication lines.

Legaspi testified that his responsibilities included making sure everything on the job site was done safely, making sure the crew followed the requirements of the TCP, and other responsibilities concerning the flaggers and their performance of the job.

On the afternoon of April 3, Edgar Alvarez happened to be driving south on Military Road South after conducting some construction inspections.  Alvarez is a Department of Labor and Industries (Department) health and safety compliance inspector.  As Alvarez drove up to the job site, he saw a flagger walking in the middle of the two-way road holding a "STOP" paddle sign.  The inspector immediately stopped his vehicle, pulled out his camera, and took photographs of the flagger standing near the center line of the two-way road with his back exposed to moving vehicles.  Alvarez then pulled to the side of the road, parked, rolled down his window, and asked the flagger to move out of the road

---

[3] The verbatim report of proceedings from the appeal hearing before the Board of Industrial Insurance Appeals identified the foreman as Luis "Lecaspi."  Because all parties and the Board identified the foreman as "Legaspi," we do as well.

3

and onto the shoulder. Alvarez testified that he did so because the flagger was exposed to a hazard of potentially being struck by moving vehicles from both directions.

The road was slightly curved. From his vantage point in the road, Alvarez could see the flagger as well as two SEFNCO employees standing by the work truck further down the road. The truck's bucket was extended, and it could barely be seen behind some tree limbs. Nothing obstructed the line of sight between the crew on the ground and the flagger in the road.

Alvarez testified that some vehicles passed about two feet more or less from the flagger, who was exposed to being struck by the vehicles. When the inspector asked the flagger who was in charge of the job site, both the flagger and Legaspi said Legaspi was the foreman and in charge.

Legaspi testified that when he was performing his work in the bucket, he was focused on the energized lines and not able to observe the flaggers. He also testified that if the ground crew had observed unsafe flagging, they would have let him know. Alvarez then called the off-site supervisor to discuss the violations, and the inspector opened a formal inspection. When Alvarez spoke to the off-site supervisor, Rob Huet, to explain what was taking place, Huet directed Alvarez to Huet's contact at LaborMax. During his investigation, Alvarez identified the flagger as Daniel Holland and photographed his flagger certification, which indicated that he was certified as a traffic control supervisor (TCS). A TCS is someone who has flagged a minimum of 2,000 hours and completed a three-day course. Alvarez testified that Holland was not acting as a

4

flagging supervisor at the job site on April 3.

Alvarez reviewed the Department records for the past three years and found that SEFNCO had a violation in 2017 for a "substantially similar hazard" where flaggers were exposed to being struck by moving vehicles. The 2017 work was conducted at a "T-intersection" and also involved an aerial crew. SEFNCO appealed the 2017 citations arguing, similarly, that the crew was focused on its task, the crew did not see a flagger in the roadway, and that SEFNCO hired trained certified and professional flaggers. SEFNCO entered into a settlement regarding the 2017 violations that resulted in reduced penalties and corrective actions, including training at least 50 employees in an eight-hour certified flagging course. As part of that agreement, SEFNCO acknowledged that the agreement did "not render the Employer immune from future compliance efforts generated by complaints, accident investigations, follow-up inspection protocol and/or by Division of Occupational Safety & Health's inspection targeting system."

Following the investigation of the 2018 incidents, the Department cited SEFNCO under WAC 296-155-305(9) for a serious violation:

> The employer did not ensure that flaggers stand either on the shoulder adjacent to the road user being controlled or in the closed lane prior to stopping road users, in that one flagger was observed and photographed directing traffic while walking and standing in the middle of a two way road close to the yellow paint stripes, exposed to being struck by moving vehicles.

The Department also cited SEFNCO under WAC 296-155-305(4) for a serious violation:

> The employer did not ensure that flaggers were positioned so they

5

were not exposed to traffic or equipment approaching them from behind, in that one flagger was observed and photographed directing traffic while walking and standing in the middle of a two way road close to the yellow paint stripes, facing away with his back turned towards the vehicles that were moving and approaching from behind, exposed to being struck by moving vehicles from behind[.]

Both citations were determined to be repeat violations and described the location as "at the site located on Military Rd South and 306th St[.] Federal Way" and stated that "[b]eing struck by a moving vehicle traveling at a speed of 40 mph could result in injuries involving permanent disability or death from injury[.]"

An industrial appeals judge (IAJ) upheld the citations. At the hearing, both Huet and Legaspi testified that Holland was a TCS. Huet, who was the person who contacted LaborMax to hire the flaggers for the job, testified that his knowledge of Holland being a TCS was based on seeing exhibits—presumably for the hearing. Legaspi was not asked how and when he learned Holland was a TCS.

The IAJ agreed that SEFNCO was a liable employer. The IAJ agreed with the Department that in applying the "economic realities" test, the key factors were (1) who had the responsibility to control the workers, and (2) whether SEFNCO had the power to control the workers. The Board of Industrial Insurance Appeals (Board) denied SEFNCO's petition for review and adopted the IAJ's proposed decision and order as the Board's decision and order. Specifically, the Board found the following:

> 2   On April 3, 2018, In Federal Way, Washington, an employee of LaborMax directed motor vehicle traffic on a SEFNCO Communications, Inc[.] worksite, while on the road and turned his head against traffic[.] As a result of his action the employee

6

was exposed to the hazard of being struck by a motor vehicle resulting serious injury or death

3   On April 3, 2018 the LaborMax employee's actions directing traffic from the roadway and turning his head against traffic are violations of WAC 296-155-305(9)(b) and WAC 296-155-305(4)

4   The violations of WAC 296-155-305(9)(b) and WAC 296-155-305(4) were correctly grouped because they could have been corrected by one action

5   SEFNCO Communications, Inc[.] contracted with LaborMax for flagging operations performed at this Jobsite on April 3, 2018, and retained control over the work being performed and had the right to cease work If LaborMax flaggers made the worksite unsafe

6   SEFNCO Communications, Inc[.] is a [joint] employer and responsible for the actions of the LaborMax flagger because of their retention of control over the work being performed

7   Based on SEFNCO Communication, Inc[.]'s history in the prior three years (specifically a violation occurring in 2017), the violations that occurred on April 3, 2018 are substantially similar and was a repeat violation resulting in the base penalty being multiplied by two

SEFNCO then appealed to the superior court, which agreed with the Board. The superior court also rejected SEFNCO's argument that the lack of specific findings as to each factor of the economic realities test warranted reversal. SEFNCO appeals.

## DISCUSSION

The parties do not dispute that the flaggers were provided by a staffing agency, LaborMax, to work for SEFNCO at the job site. Host employers to temporary workers from staffing agencies may be held liable for violations of the Washington Industrial Safety and Health Act of 1973, ch. 49.17 RCW. Potelco vs. Dep't of Labor & Indus., 191 Wn. App. 22, 361 P.3d 767 (2015).

Standard of Review

WISHA statutes and regulations are interpreted liberally to achieve the purpose of providing safe working conditions for workers in Washington State. Dep't of Labor & Indus. v. Tradesmen Int'l, LLC., 198 Wn.2d 524, 534-35, 497 P.3d 353 (2021) (citing Erection Co. v. Dep't of Labor & Indus., 160 Wn. App. 194, 202, 248 P.3d 1085 (2011)). In WISHA appeals, we review the Board's decision based on the record before the agency and determine whether the Board's findings of fact are supported by substantial evidence. Erection Co. 160 Wn. App. at 201; Tradesmen, 198 Wn.2d at 534. We do not reweigh the evidence before the Board, but determine whether the Board's factual findings support the conclusions of law. Potelco, 191 Wn. App. at 22. We view the evidence in the light most favorable to the Department. Frank Coluccio Constr. Co. v. Dep't of Labor & Indus., 181 Wn. App. 25, 35, 329 P.3d 91 (2014).

Violations

SEFNCO contends that substantial evidence does not support the Board's finding that a flagger directing traffic from the roadway violated WAC 296-155-305(9)(b) when the flagger stood in the road facing oncoming traffic that was still moving. We disagree.

WAC 296-155-305(9)(b) provides:

Providing a safe job site for flaggers. Employers, responsible contractors and/or project owners must make sure that:

(b) Flaggers stand either on the shoulder adjacent to the road user being controlled or in the closed lane prior to stopping road users. A flagger must only stand in the lane being used by moving road users after road users have stopped.

SEFNCO contends that "flaggers have legitimate reasons to be in the road." It further argues that flaggers are "especially likely to enter the road during work around a bend where line-of-site contact may be required". However, the issue is not whether a flagger could ever be in a road, it is whether the flagger was standing "in the lane being used by moving road users *after* road users have stopped." WAC 296-155-305(9)(b) (emphasis added).

Alvarez, the inspector, was driving in the lane the flagger was controlling. As he drove up to the job site, the flagger was already in the road with his stop paddle facing Alvarez. Alvarez stopped his moving vehicle after he saw the flagger's stop paddle. Substantial evidence supports the Board's finding that the LaborMax employee's actions directing traffic from the roadway violated WAC 296-155-305(9)(b).

WAC 296-155-305(4) provides the following in part regarding the prevention of traffic approaching workers from behind:

(4) Adequate warning of approaching vehicles. You must:

• Position work zone flaggers so they are not exposed to traffic or equipment approaching them from behind.

– If this is not possible, then the employer, responsible contractor, and/or project owner must develop and use a method to ensure that flaggers have adequate visual warning of traffic and equipment approaching from behind.

Note: • The following are some optional examples of methods that may be used to adequately warn or protect flaggers:

    – Mount a mirror on the flagger's hard hat.
    – Use an observer.
    – Use "jersey" barriers.

SEFNCO argues that the alleged violation lasted only a second or two because

the photographs taken by Alvarez showed the flagger merely flicked his head away from Alvarez twice in the span of a minute to check for traffic coming from the other direction, which is an approved technique for flaggers.

SEFNCO ignores the fact that the flagger was already standing near the middle of the two-way road near the yellow center line with his back toward on-coming traffic in the other lane at the time Alvarez approached. The flagger was positioned in a way that exposed him to traffic approaching from behind. Substantial evidence supports the Board's finding that the LaborMax employee's actions directing traffic from the roadway and turning his head against traffic violated WAC 296-155-305(4).

We hold that the Board's findings of fact supported its conclusion that an employee of LaborMax committed serious violations of WAC 296-155-305(9)(b) and WAC 296-155-305(4) as alleged in the violations.

### Joint Employer

SEFNCO next argues that it should not have been cited with a violation because it was not a joint employer of the LaborMax flaggers. We disagree.

Washington courts utilize the seven-factor "economic realities" test in joint employer situations to determine liability for WISHA violations. Tradesmen, 198 Wn.2d at 536; Potelco, 191 Wn. App. at 30. "In the joint employment context, both the staffing agency and the host employer may be cited if they possess substantial control over the workers and the work environment involved in the violations." Tradesmen, 198 Wn.2d at 541. The factors include the following:

1) who the workers consider their employer;
2) who pays the workers' wages;

3) who has the responsibility to control the workers;
4) whether the alleged employer has the power to control the workers;
5) whether the alleged employer has the power to fire, hire, or modify the employment condition of the workers;
6) whether the workers' ability to increase their income depends on efficiency rather than initiative, judgment, and foresight; and
7) how the workers' wages are established.

Tradesmen, 198 Wn.2d at 535-36. These are non-exclusive factors. Tradesmen, 198 Wn.2d at 542. "The factors more closely related to control are given more emphasis because they are directly tied to WISHA's remedial purpose of ensuring safe and healthful working conditions. . . . Such key factors include who has responsibility and power to control the workers and work site and whether the alleged employer has the power to hire, fire, or modify the employment conditions." Id. (internal citations omitted).

SEFNCO, citing Adcock v. Chrysler Corp., 166 F.3d 1290, 1293 (9th Cir. 1999), first contends that the Board committed reversible error by not addressing all of the economic realities test factors. However, "[n]o objection that has not been urged before the board shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." RCW 49.17.150(1). SEFNCO did not raise this argument in its petition for review to the Board. Even so, Adcock is inapposite. Adcock is a Ninth Circuit case out of California that considered whether an employment relationship is covered by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. Employer liability differs by statute and may not translate to liability under WISHA. Tradesmen, 198 Wn.2d at 537. Also, we have determined that the lack of evidence in the record as to some factors does not necessarily

11

prohibit appellate review. See Potelco, 191 Wn. App. at 33 (analyzing the economic realities test when the record was absent any evidence as to whether factors six or seven weighed in favor of the appellant). The lack of specific findings of fact as to each factor does not constitute reversible error.

As to the first two factors, the parties do not dispute that LaborMax is a labor service that provided flagging and control services for SEFNCO and did so for the job site at issue. SEFNCO sent a purchase order to LaborMax for payment. At issue here are factors three and four, which relate to control.

As to factor three and four, we first will address whether Holland was a certified TCS as implied by SEFNCO. Without directly claiming that Holland was working at the job site as a traffic control *supervisor*, SEFNCO implies as much by contending we should take into consideration the fact that Holland was a certified TCS and that, following its 2017 violations, SEFNCO required LaborMax to send at least one TCS to all jobs to supervise flagging. This implication is misleading.

First, Alvarez happened to document that Holland was a TCS when he photographed his credentials at the job site. Nothing in the record supports anyone identifying Holland as someone who was hired and working as a flagging supervisor at the job site. When Alvarez explained what the issue was, Legaspi referred Alvarez to his supervisor, Huet. Huet referred Alvarez to SEFNCO's contact at LaborMax. Neither Legaspi nor Huet stated Holland was the on-site supervisor of the flaggers. The general manager for SEFNCO testified below that SEFNCO had a requirement from LaborMax that it would provide a TCS to

12

be on site for SEFNCO operations. And though the manager said it was "in part" in response to the 2017 citations, this TCS requirement was imposed around April 28, 2018, after the April 3 citations. In fact, Huet is the person who sent LaborMax the request for the April 3 job. He testified the reason he knew a TCS was on site was because he saw Holland's credentials from the exhibits. Huet did not testify that he specifically hired a TCS to be responsible for all supervision of the flaggers. Alvarez, who interviewed Holland, testified that he did not believe Holland was acting as a flagging supervisor on April 3.

Second, on April 3, Legaspi, the SEFNCO foreman, held a safety meeting before work commenced and made sure everyone, including flaggers, had on proper PPE. The flaggers were directed to perform their work pursuant to the TCP. The foreman noted in the comments of the tailgate safety form to be safe, have signs out, and watch for traffic. Legaspi showed the flaggers the job site and where they would be setting their traffic signs. The flaggers were each located about 50 to 100 feet from the work truck in opposite directions. When Alvarez drove up to the job site and saw Holland in the middle of the road, he also could see two SEFNCO workers down the road by the truck. When Alvarez asked who was in charge at the job site, both Holland and Legaspi said Legaspi was in charge. Legaspi testified that his crew would have alerted him if they had seen flagging conducted in an unsafe manner.

As to factor five, although SEFNCO did not have the ability to hire or fire specific LaborMax flaggers, it did retain the right to stop all work if LaborMax employees were not acting safely. Nothing in the record addressed factors six

13

and seven other than establishing that SEFNCO did not set the flaggers' wages.

We conclude that substantial evidence supports the Board's finding that SEFNCO retained control over the work being performed and had the right to cease work if LaborMax flaggers made the worksite unsafe. We also conclude that substantial evidence supports the Board's finding that SEFNCO "is a [joint] employer and responsible for the actions of the LaborMax flagger because of their [sic] retention of control over the work being performed."

Constructive Knowledge

SEFNCO further contends that even if it were to be considered a joint employer, it did not have knowledge of the violation and therefore should not be held liable. We disagree.

Under WISHA, an employer has a general duty to provide employees a place of employment free from recognized hazards likely to cause serious injury or death and a specific duty to comply with the rules, regulations, and orders promulgated under WISHA. RCW 49.17.060(1); Pro-Active Home Builders, Inc. v. Washington State Dep't of Labor & Indus., 7 Wn. App. 2d 10, 16-17, 465 P.3d 375 (2018).

RCW 49.17.180(7) provides the definition of a serious violation as follows:

[A] serious violation shall be deemed to exist in a workplace if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use in such workplace, unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.

To establish a serious violation of a WISHA safety regulation, the

14

Department must prove:

> (1) the cited standard applies, (2) the requirements of the standard were not met, (3) employees were exposed to or had access to the violative condition, (4) *the employer knew or through the exercise of reasonable diligence could have known of the violative condition*, and (5) there is a substantial probability that death or serious physical harm could result from the violative condition.

Bayley Constr. v. Washington State Dep't of Labor & Indus., 10 Wn. App. 2d 768, 783, 450 P.3d 647 (2019) (emphasis added). An employer's knowledge can be actual or constructive, and common knowledge can be used to establish that a hazard is recognized. Pro-Active, 7 Wn. App. 2d at 18. Further, "[c]onstructive knowledge of a violative condition may be demonstrated by the department in a number of ways, including evidence showing that the violative condition was readily observable or in a conspicuous location in the area of the employer's crews." Erection Co., Inc. v. Dep't of Labor & Indus., 160 Wn. App. at 207.

The Board found that SEFNCO "had constructive knowledge through their [sic] employees who were trained in flagging operations and retention, noted in testimony and briefing, of control over the worksite." SEFNCO argues that it did not have constructive knowledge because it had an effective safety program, it had no reason to expect that the work would not be performed safely by a "TCS-certified flagger," the alleged violations lasted less than a minute, and the flagger was 50 to 100 feet away from the truck behind a tree and around a bend in the road.

However, substantial evidence supports the finding of constructive knowledge because the violative condition was readily observable. It also was in a conspicuous location within eyesight of SEFNCO's crew who were on the

ground.  The photograph taken by the inspector of the flagger standing in the public roadway also shows SEFCNO's crew on the ground down the road from the flagger.  See Pro-Active, 7 Wn. App. 2d at 19 (inspector "could see the safety violations from his car when he arrived at the jobsite."); BD Roofing, 139 Wn. App. at 110 ("WISHA's compliance officer observed the violation as he drove past the site.").  SEFNCO argues that the violations lasted less than a minute.  Alvarez testified that it was a matter of minutes or less than a minute between the time he first observed the flagger and the time he pulled to the side of the road.  However, that contention does not establish how long the flagger had been standing in the road prior to Alvarez's arrival.  Nothing in the record suggests that the flagger had previously been flagging from the side of the road.  Regardless, Washington State has not included duration as a required element to prove an employer's constructive knowledge.  Pro-Active, 7 Wn. App. 2d at 19.  When viewed in the light most favorable to the Department, we conclude that the record contains substantial evidence that SEFNCO could, with reasonable diligence, have learned that the LaborMax employee was flagging in an unsafe manner.  See Erection Co., 160 Wn. App. at 206-07 (rejecting an employer argument that the employee engaged in acts that no one would have expected).

We conclude that the Board's findings support its conclusion that SEFNCO was a joint employer.

## Repeat Violation

SEFNCO lastly contends that the Board erroneously found that the alleged violations were substantially similar to a 2017 violation issued to

16

SEFNCO.  We disagree.

WAC 296-800-099 provides that a repeat violation occurs when "the employer has been cited one or more times previously for a substantially similar hazard."[4]  SEFNCO argues that the circumstances of each violation were not substantially similar because the 2017 violations involved a T-intersection and the 2018 citations involved a mobile operation.  However, the court considers whether the *hazards* were substantially similar.  Id. (Emphasis added.)  The 2017 violation concerned two flaggers who "were observed standing in active lanes of traffic with moving vehicles."  That hazard is substantially similar to the hazard in the instant case where a flagger stood in the road with oncoming traffic.

Finally, SEFNCO, for support, points to the fact it complied with its abatement obligations after its 2017 inspection.  However, the settlement agreement, which was the source of the abatement obligations, stated it did not render SEFNCO immune from future compliance efforts.  We conclude substantial evidence supports the Board's finding for repeat violations.

We affirm.

_____
Coburn, J.

WE CONCUR:

_____                 _____
                                                                          Mann, J.

---

[4] Because this language is the same in the applicable Former WAC 296-800-370 (2020), we cite to the current statute.