IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| 1UP FLOORS, LLC,<br><br>               Appellant,<br><br>     v.<br><br>DEPARTMENT OF LABOR &<br>INDUSTRIES,<br><br>               Respondent. | No. 80403-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUN, J. — 1Up Floors, LLC, engaged Molina's Flooring as a subcontractor to replace flooring in an apartment unit in Seattle. A Molina's employee removed vinyl tiles during the project. A Compliance Safety and Health Officer (CSHO) from the Department of Labor and Industries discovered asbestos in the tiles.

The Department cited 1Up for multiple violations of the Washington Industrial Safety and Health Act (WISHA).[1] 1Up appealed to the Board of Industrial Insurance Appeals. After a hearing, an Industrial Appeals Judge (IAJ) issued a Proposed Decision and Order affirming the Department's citation. And the Board affirmed (3-0) on review and issued a Decision and Order. 1Up appealed to the superior court, which affirmed the Board's decision.

1Up appeals, claiming (1) substantial evidence does not support the Board's findings that 1Up knew of the asbestos and that it exposed its employees

---

[1] Chapter 49.17 RCW.

Citations and pin cites are based on the Westlaw online version of the cited material.

to a substantial probability of death or serious physical harm and (2) the Board abused its discretion by affirming the Department's penalty calculations. We affirm.

## I. BACKGROUND

Tecton, a general contractor, hired 1Up to replace flooring in apartment units at a building on Columbian Way in Seattle. The building had been constructed in the 1960s. 1Up subcontracted with Molina's for the labor. Work began in December 2016.

On February 24, 2017, Puget Sound Clean Air, a government agency that regulates air quality, alerted Kenya Saenz, a CSHO, of a potential asbestos hazard at the apartment building. The same day, Saenz inspected the worksite. When she arrived at Unit 404 (Unit), she saw Isais Antonio, a Molina's employee, cleaning. There was a NIOSH[2] mask on the kitchen counter. But Antonio was not wearing one. Removal of the flooring had occurred before Saenz arrived, but there were still piles of debris in the apartment. The removed flooring included layers of carpet, plywood, and vinyl tiles. Saenz estimated that 73 square feet of flooring had been removed in the Unit.

The same day, CSHO Saenz conducted an "opening conference"[3] with Molina's and interviewed Eduardo Molina, the owner of Molina's, and Antonio.

---

[2] National Institute for Occupational Safety and Health.

[3] During an opening conference, a CSHO will speak to the owner or employer representative of the company, explain the purpose and scope of the inspection, and interview employees. DIV. OF OCCUPATIONAL SAFETY HEALTH, DEP'T OF LABOR & INDUS., DOSH COMPLIANCE MANUAL, (March 1, 2020), https://lni.wa.gov/safety-health/safety-rules/enforcement-policies/DOSHComplianceManual.pdf [https://perma.cc/D9PF-AMFH].

The company told her it was subcontracting with 1Up to remove old flooring and install new flooring.

Antonio said he did not know what asbestos was exactly and had not received any training on it. He told Saenz that he had been on site for only an hour that day, and that he had worn the mask while he removed the flooring.

Molina told Saenz that he had some awareness of asbestos through training at a previous job, but he was not a licensed asbestos contractor. She asked Molina if the company had a copy of the asbestos good faith survey as required by WAC 296-62-07721(1)(c)(ii). He responded that he "did not know what that was or if they ever had one."

Saenz then asked Tecton for the good faith survey, which it also did not possess. Because a good faith survey had not been performed, Saenz ordered all work to stop pending an inspection.

During her inspection, CSHO Saenz took bulk samples of flooring material from the Unit and sent them to the Department's lab. Layer 1 of Sample 2 was vinyl tile. It tested positive for chrysotile, a common form of asbestos in floor coverings, in a concentration between one and three percent.

On March 10, 2017, CSHO Saenz held an opening conference with 1Up. 1Up also did not have a copy of a good faith survey and had not asked Tecton for one. 1Up said that because it subcontracted the work to Molina's, it did not consider them its employees, and thus it did not provide personal protective equipment (PPE) to them. When contracting with Tecton, 1Up did not ask about the building's age or the presence of asbestos. 1Up's price estimate sheet,

3

which it gave to Tecton, stated prices for "Sheet Vinyl Replacement" and "Vinyl Plank Replacement."  The subcontract between 1Up and Molina's states that the "kitchen repair requires . . . [u]nderlayment."

On May 15, 2017, the Department cited 1Up for multiple WISHA violations.  Citation items 1-1 to 1-8 were classified as serious violations.  For purposes of the penalty calculations, CSHO Saenz set the probability rate[4] at 2 for all citation items except for 1-8.[5]  She also classified 1Up as acting with below average faith.[6]  On August 1, 2017, the Department issued a Corrective Notice of Redetermination (CNR), affirming the citation.

1Up appealed to the Board of Industrial Insurance Appeals.  During the proceedings, 1Up stipulated (1) to technical non-compliance with the applicable WISHA provisions, and (2) that it was an employer of Molina's employees for purposes of WISHA.  But 1Up contested that it had committed serious violations, arguing it lacked knowledge of the asbestos and it had not exposed its employees to a substantial probability of death or serious physical harm; it also contested the Department's penalty calculations.

---

[4] A probability rate is a measure of the likelihood that injury or illness will occur from a violation and is used to calculate penalties.  Danzer v. Dep't of Labor & Indus., 104 Wn. App. 307, 321 n.8, 16 P.3d 35 (2000) as amended (Jan. 19, 2001).  A probability rate of 2 is "moderate."  WAC 296-900-14010.

[5] Only serious violations are subject to penalties, so only citation items 1-1 through 1-8 were subject to penalties; the remaining citation items, 2-1 through 2-4, were general violations and not subject to penalties.  Item 1-8 received an automatic probability rating of 1 (meaning, "relatively low") because it concerned 1Up's failure to create an accident prevention program.

[6] When calculating penalties, the Department rates an employer as acting with "good," "average," or "below average" faith and uses that rating to adjust the base penalty rate.  WAC 296-900-14015.

An IAJ held a hearing in which the Department presented the testimony of CSHO Saenz and Nicholas Ryan Marchel of 1Up. The Department also introduced photographs of the worksite. 1Up presented testimony by Douglas Henry, an expert on occupational safety and health. On June 14, 2018, the IAJ issued a Proposed Decision and Order affirming the CNR.

1Up petitioned for review of the Proposed Decision and Order, which petition the Board granted. The Board issued a Decision and Order affirming (3-0) the Proposed Decision and Order.

1Up appealed to the superior court. On July 31, 2019, the superior court affirmed the Board.

1Up appeals.

## II. ANALYSIS

A. Serious Violations

1Up says that its actions did not constitute serious violations of WISHA. It says that substantial evidence does not support the Board's findings that 1Up knew of the asbestos and that it exposed its employees to a substantial probability of death or serious physical harm. We disagree.

To prove a serious violation of WISHA, the Department must establish the following:

> (1) the cited standard applies; (2) the employer did not meet the standard; *(3) employees were exposed to, or had access to, the violative condition; (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition, and (5) there is a substantial probability that death or serious physical harm could result from the violative condition.*

5

Shimmick Constr. Co., Inc. v. Dep't of Labor & Indus., 12 Wn. App. 2d 770, 779, 460 P.3d 192 (2020) (emphasis added); RCW 49.17.180.  1Up contests the Board's findings relating to elements 3, 4, and 5.

We review the Board's decision directly by looking at the record before the agency.  Shimmick Constr., 12 Wn. App. 2d at 778; Erection Co. v. Dep't of Labor & Indus., 160 Wn. App. 194, 201, 248 P.3d 1085 (2011).  We review for substantial evidence the Board's findings of fact.  Shimmick Constr., 12 Wn. App. 2d at 778.  "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise."  Mowat Const. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 925, 201 P.3d 407 (2009).  And we view the evidence and reasonable inferences therefrom in the light most favorable to the prevailing party in the highest forum that exercised fact-finding authority.  Shimmick Constr., 12 Wn. App. 2d at 778–79; Erection Co., 160 Wn. App. at 202.  If substantial evidence, given the record as a whole, supports the findings of fact, the findings are conclusive.  RCW 49.17.150(1), RCW 34.05.570(3)(e), Mowat Const., 148 Wn. App. at 925.  We then determine whether the findings of fact support the conclusions of law.  Erection Co., 160 Wn. App. at 202.

We review de novo the Board's interpretations of statutes and regulations. Id. at 201.  And we "construe WISHA statutes and regulations liberally to achieve their purpose of providing safe working conditions for workers in Washington." Frank Coluccio Const. Co., Inc. v. Dep't of Labor & Indus., 181 Wn. App. 25, 36, 329 P.3d 91 (2014).

1. Knowledge of the violative condition

1Up says that substantial evidence does not support the Board's finding that the company had constructive knowledge of the asbestos in the Unit. We disagree.

Whether a violation qualifies as serious depends on whether the employer had actual or constructive knowledge of the violative condition.[7] BD Roofing, Inc. v. Dep't of Labor & Indus., 139 Wn. App. 98, 108, 161 P.3d 387 (2007). An employer has constructive knowledge if, had it exercised reasonable diligence, it could have known of the violative condition. Erection Co., 160 Wn. App. at 205. "Reasonable diligence involves several factors, including an employer's obligation to inspect the work area, to anticipate hazards to which employees may be exposed, and to take measures to prevent the occurrence." Id. at 206–07 (quoting Kokosing Const. Co. v. Occupational Safety & Hazard Review Comm'n, 232 F. App'x. 510, 512 (6th Cir. 2007)).

Viewing the evidence and inferences in the light most favorable to the Department, substantial evidence supports the Board's finding that 1Up had constructive knowledge of the asbestos in the Unit because it could have discovered the asbestos through reasonable diligence.

1Up did not exercise reasonable diligence. It failed to obtain or even request a good faith survey from Tecton. See WAC 296-62-07721. Before authorizing any construction, a building owner must conduct a good-faith inspection of the property to determine if the materials to be worked on or

_____

[7] The Board made no finding about actual knowledge.

removed contain asbestos. WAC 296-62-07721(1)(c)(ii), (2)(b)(ii). A contractor such as 1Up may not begin construction without first receiving a copy of the good faith survey. WAC 296-62-07721(2)(e).

Nor did 1Up ask about the presence of asbestos at the worksite. Marchel of 1Up testified that the company asks about asbestos "if we are [led] to believe that asbestos is in the building." But 1Up's own expert stated that asbestos is "prevalent on almost every job site" and that one is likely to come across it during a construction job. And buildings built before the 1980s are presumed to have asbestos-containing material. WAC 296-62-07703. Yet 1Up did not ask about the age of the building.

Had 1Up exercised reasonable diligence, it could have known of the asbestos. Though Tecton itself did not have the required good faith survey, if 1Up had asked for it, the resulting inspection would have revealed the presence of asbestos.[8]

1Up says that it did not know about the violative condition because it did not ask Molina's to remove the vinyl tiles and did not expect that it would do so. Marchel testified that 1Up typically installs new flooring over the old flooring. Marchel noted that 1Up approved removal of deteriorated plywood in the bathroom. But because the plywood was above the vinyl tile layer, it did not ask that the tiles be removed, and did not expect Molina's to do so.

---

[8] After the Department's inspection, Tecton hired an inspector who found asbestos in the apartment complex.

But 1Up's price estimate sheet for the project, which it gave to Tecton, stated prices for "Sheet Vinyl Replacement" and "Vinyl Plank Replacement." And the subcontract states that the "kitchen repair requires . . . [u]nderlayment." Also, Molina's told CSHO Saenz that they were there to remove old flooring.

Given the foregoing, viewing the evidence and inferences in the light most favorable to the Department, substantial evidence supports the Board's finding that 1Up had constructive knowledge of the asbestos in the Unit.

2. Exposure to a violative condition

1Up says that substantial evidence does not support a finding that it exposed its employees to a hazard that had a substantial probability of causing death or serious physical harm. The Department emphasizes that whether there was exposure and whether there is probability of harm require separate analyses, and that substantial evidence supports the Board's findings on both. We agree with the Department.

a. Exposure

The Department can prove exposure—for purposes of a serious violation—by showing actual exposure or by showing that an employee had access to a violative condition. Shimmick Constr., 12 Wn. App. 2d at 785. An employee had access to a violative condition if there was a "reasonable predictability" that during work the employee was in the "zone of danger." Shimmick Constr., 12 Wn. App. 2d at 785 (quoting Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus., 136 Wn. App. 1, 5, 146 P.3d 1212 (2006)). The

9

zone of danger is the area around the violative condition that presents the danger that the statute is intended to prevent. Id.

In Shimmick Constr., the court held that employees were exposed to a hazard when using cranes underneath live power lines. Id. at 786. The employer asserted that the employees were not exposed because the cranes were not within 10 feet of the power lines. Id. The court held that because of the design of a crane, and its capability to come within 10 feet of a power line, employees using the cranes were exposed to a violative condition. Id.

Substantial evidence supports the Board's finding that 1Up's employee, Antonio, was exposed to asbestos. Antonio had access because he removed vinyl tiles in the Unit, which contained asbestos. CHSO Saenz saw Antonio cleaning debris inside the Unit. In Shimmick Constr., it was enough that the employees were close to and could easily have contact with the violative condition. Comparatively, Antonio was not only close to the asbestos, he was actively handling it. And despite a regulation requiring that asbestos-containing material be handled in a wet state, he was handling the vinyl tiles dry, increasing the risk. See WAC 296-62-07712(2).

Because asbestos can cause cancer, mesothelioma, and asbestosis, its presence can create a zone of danger. See Netversant Wireless Sys. v. Dep't of Labor & Indus., 133 Wn. App. 813, 825, 138 P.3d 161 (2006) (interpreting WISHA broadly because of the "pervasive danger of asbestos particles."). There are multiple routes of exposure to asbestos: through inhalation, absorption, and ingestion. Because asbestos is dangerous and the routes of exposure are

broad, removing and cleaning asbestos-containing material in an enclosed apartment places an employee in the zone of danger.

1Up introduced expert testimony that it was highly unlikely that there was airborne asbestos in an amount higher than the permissible exposure limit in the Unit. The expert, Douglas Henry, testified that for fibers to be released there must be a disturbance. He explained that the amount of fibers released depends on what "matrix" (i.e., material) binds the asbestos. He stated that asbestos is tightly bound to vinyl tiles[9] and that it is "extremely difficult, if not almost impossible" to release individual asbestos out of vinyl tile. Based on this, 1Up says that because it is unlikely that asbestos fibers were airborne as a result of removing vinyl tiles, its employees were not in danger.

But the only way to learn the level of asbestos fibers in the air is to conduct air monitoring. And the Department cited 1Up specifically because it did not conduct air monitoring. Based on the record, there is no way to know the concentration of fibers in the air in the Unit at the time of removal. And even if concentrations of asbestos fibers in the air were low, they still posed a danger. In re William Dickson Co., No. 99 W0381, at *4 (Wash. Bd. Indus. Ins. App. Dec. 11, 2001)[10] ("We disagree with any suggestion that proof of a serious violation of

---

[9] The likelihood of asbestos fibers releasing from a matrix depends in part on the friability of the material. If a material is friable, it can be crushed by hand. The Department lab report did not comment on the vinyl tile's friability.

[10] We recognize significant Board decisions as persuasive authority when interpreting the Industrial Insurance Act. Dep't of Labor & Indus. v. Lyons Enters., Inc., 186 Wn. App. 518, 535 n.8, 347 P.3d 464 (2015), aff'd, 185 Wn.2d 721, 374 P.3d 1097 (2016). Significant Board decisions are published and made available to the public. RCW 51.52.160. In re William Dickson Co., is a significant Board decision. No. 99 W0381 (Wash. Bd. Indus. Ins. App. Dec. 11, 2001).

WISHA regulations requires a showing of the actual extent of exposure to asbestos fibers together with medical testimony establishing a substantial probability that death or serious harm could result from such exposure.").

Also, this inhalation-based argument ignores the other routes of exposure: absorption and ingestion, which may still be possible even when exposure by inhalation is not. Antonio told CSHO Saenz that he wore the NIOSH mask while he performed the removal. But the mask protects against only inhalation. Saenz noted that Antonio was otherwise wearing normal street clothing—not required protective gear which guards against the exposure route of absorption. WAC 296-62-07717 (requiring full-body work clothing, goggles, and gloves).

Compounding the risk, neither Molina nor Antonio were licensed asbestos contractors. Because Antonio did not know what asbestos was exactly and had no training on working with asbestos, he was more vulnerable to the dangers it posed. Indeed, he was not wearing the NIOSH mask while cleaning, even though the vinyl tile debris was still in the apartment.

Viewing the evidence and inferences therefrom in the light most favorable to the Department, substantial evidence supports the finding of exposure.

b. Substantial probability of death or serious physical harm

For a serious violation, the Department must also prove that there is a "substantial probability that death or serious physical harm could result from" a violative condition. RCW 49.17.180. Substantial probability "refers not to the likelihood that the harm will occur but, rather, the likelihood that any harm that *would* result from the violation would be serious injury or death." Shimmick

12

Constr., 12 Wn. App. 2d at 777.  Thus, there may be a serious violation even if it is "extremely unlikely" that anyone will be injured.  Id. at 788 (quoting Lee Cook Trucking & Logging v. Dep't of Labor & Indus., 109 Wn. App. 471, 481, 36 P.3d 558 (2001)).

Because asbestos is well known to cause serious disease or death, there is substantial evidence to find that 1Up exposed its employees to a substantial probability of death or serious physical harm.  As mentioned above, asbestos can cause cancer, mesothelioma, and asbestosis, and can lead to death.  1Up relies on its argument above, about the extreme difficulty of releasing asbestos fibers from vinyl tiles into the air, to argue that such a substantial probability does not exist.  But again, the fact that a harm is unlikely to occur does not mean there was no serious violation.  See Shimmick Constr., 12 Wn. App. 2d at 788.  If harm did occur here, there is a substantial probability that it would be serious.  See Netversant Wireless, 133 Wn. App. at 825 (interpreting WISHA broadly because of the "pervasive danger of asbestos particles"); 20 U.S.C. § 3601 ("exposure to asbestos fibers has been identified over a long period of time and by reputable medical and scientific evidence as significantly increasing the incidence of cancer and other severe or fatal diseases, such as asbestosis").

Viewing the evidence and inferences therefrom in the light most favorable to the Department, substantial evidence supports the finding of substantial probability of death or serious physical harm.

B. Penalty Calculations

1Up says that the Board abused its discretion by affirming the

13

Department's penalty calculations, which stemmed generally from a probability score of 2[11] and a below average faith classification. We disagree.

The Department has the authority to assess civil penalties, considering "the number of affected employees of the employer being charged, the gravity of the violation, the size of the employer's business, the good faith of the employer, and the history of previous violations." RCW 49.17.180; Ostrom Mushroom Farm Co. v. Dep't of Labor & Indus., 13 Wn. App. 2d 262, 276, 463 P.3d 149 (2020). The Department calculates the gravity of a violation by multiplying a severity rate by a probability rate. WAC 296-900-14010. The gravity factor determines the base penalty for a violation. Danzer v. Dep't of Labor & Indus., 104 Wn. App. 307, 320, 16 P.3d 35 (2000), as amended (Jan. 19, 2001). The Department adjusts the base penalty based on multiple factors, including an employer's good faith. Id. at 320–21. 1Up contests the probability rate and its classification as below average good faith.

We review a penalty determination for abuse of discretion. Ostrom Mushroom, 13 Wn. App. 2d at 276; Potelco, Inc. v. Dep't of Labor & Indus., 7 Wn. App. 2d 236, 253, 433 P.3d 513 (2018). "An abuse of discretion occurs where the decision is arbitrary or rests on untenable grounds or reasons." Ostrom Mushroom, 13 Wn. App. 2d at 276.

1. Probability rate

"A probability rate is a number that describes the likelihood that an injury,

---

[11] The exception is citation item 1-8, which automatically received a probability rate of 1. 1Up does not contest this rating.

illness, or disease will occur [in an employee] ranging from 1 (lowest) to 3 (highest)." WAC 296-900-14010. A probability rate of 2 is moderate. WAC 296-900-14010. The Department considers these factors in setting a probability rate: frequency and amount of exposure; number of employees exposed; instances, or number of times, the hazard is identified in the workplace; how close an employee is to the hazard; weather and other working conditions; employee skill level and training; employee awareness of the hazard; the pace, speed, and nature of the work; use of PPE; and other mitigating or contributing circumstances. WAC 296-900-14010.

The Board did not abuse its discretion in affirming a probability rate of 2. The factors that the Board relied on show that its decision was not arbitrary or resting on untenable grounds.

The Board highlighted that Antonio was not trained or licensed to work with asbestos, inadequate PPE was used, and no engineering controls were implemented.

Though Antonio said he wore the NIOSH mask while performing the vinyl tile removal, he otherwise had inadequate PPE. Antonio did not wear the mask while cleaning, though asbestos-containing debris was still in the apartment. And Antonio apparently did not use other protective gear such as full-body coveralls, gloves, and goggles. WAC 296-62-07717.

Also, there were no engineering controls on the worksite. WAC 296-62-07712(2) requires that, regardless of the level of exposure, employers must

ensure that asbestos is removed in a wet state. 1Up failed to do so; it stipulated to technical noncompliance because it allowed dry vinyl tiles to be removed.

On the other hand, the Board noted that some factors may lower the probability of an illness or disease. As discussed above, 1Up's expert testified that it is extremely difficult to release asbestos fibers from vinyl tile, so there may not have been a high probability of being exposed to it. And the space where the employees removed the vinyl tiles was about 73 square feet, so the amount of asbestos-containing material was limited. Relatedly, the removal process was relatively quick. Antonio had been working for only an hour when CSHO Saenz arrived and the removal was already completed.

To reach the probability rate of 2, which is moderate, the Department balanced the mitigating and aggravating factors. The Board did not arbitrarily affirm this determination, and thus acted within its discretion. See Ostrom Mushroom, 13 Wn. App. at 276 (a probability rate of 1 was appropriate where the chemical at issue was only used for a short duration during the work day).

2.  Good faith

The Department adjusts the base penalty rate based on its determination that the employer acted in good, average, or below average faith. WAC 296-900-14015. In making this determination, the Department considers: evidence of an overall safety and health program, including a written accident prevention program; efforts to fully communicate safety and health policies; employee involvement in the safety and health programs; management's commitment at all levels; and employer's injury and illness rate. WAC 296-900-14015. "Conscious

16

disregard of risks, delays in correcting a violation, deceptive behavior, and willful resistance to compliance are all indicative of a lack of good faith." Potelco, 7 Wn. App. 2d at 253.

The Department did not abuse its discretion in determining that 1Up acted with below average faith. In reaching this determination, the Department mainly highlighted that 1Up had no safety and health documents or an accident prevention program addressing asbestos at the worksite.

1Up says that it lacks such documents or programs because it chose not to work with asbestos. But this explanation appears to ring hollow given the prevalence of asbestos in the construction business.

Other practices also support a finding of below average faith. 1Up said it never asked about the age of the building and asked about the presence of asbestos only "if we are [led] to believe that asbestos is in the building." It also failed to request a good faith survey from Tecton, and had Molina's begin work before completion of such a survey.

The Board did not abuse its discretion in affirming the determination that 1Up acted with below average faith.

We affirm.

_Chun, J._

WE CONCUR:

_Bowman, J_        _Andrus, A.C.J._