**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
OCTOBER 28, 2021

_Gonzáles, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
OCTOBER 28, 2021

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE OF WASHINGTON, )<br><br>Petitioner, )<br><br>v. )<br><br>TRADESMEN INTERNATIONAL, LLC, )<br><br>Respondent. ) | No. 99031-0<br>(consolidated with 99032-8)<br><br>En Banc |
| DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE OF WASHINGTON, )<br><br>Petitioner, )<br><br>v. )<br><br>LABORWORKS INDUSTRIAL STAFFING SPECIALISTS, INC., )<br><br>Respondent. ) | Filed: October 28, 2021 |

JOHNSON, J.—These cases involve the liability of temporary worker

staffing agencies for violations of the Washington Industrial Safety and Health Act

No. 99031-0 (consol. with 99032-8)

of 1973 (WISHA), ch. 49.17 RCW. Tradesmen International and Laborworks Industrial Staffing Specialists are staffing agencies that place temporary workers with host employers. Tradesmen staffed a worker at a Dochnahl Construction site. Laborworks staffed workers at a Strategic Materials recycling facility. The Department of Labor and Industries (Department) cited the staffing agencies for WISHA violations arising from the staffing operations.

In both cases, the citations were vacated by the Board of Industrial Insurance Appeals (Board), finding that the staffing agencies were not liable employers under WISHA. The Department appealed the decisions to the superior court. As to Laborworks, the superior court reinstated the citations, and as to Tradesmen, the superior court affirmed the Board and vacated the citations. In both cases, the Court of Appeals determined that the staffing agencies were not liable employers under WISHA and vacated the citations. We granted review and consolidated the cases.[1] *Dep't of Labor & Indus. v. Tradesmen Int'l, LLC*, 14 Wn. App. 2d 168, 470 P.3d 519 (2020), *review granted*, 196 Wn.2d 1036 (2021). We affirm the Court of Appeals as to Tradesmen and reverse as to Laborworks.

---

[1] Two amici briefs were filed by the National Employment Law Project, Dr. David Michaels, and Dr. Michael Silverstein, and the Washington State Labor Council, AFL-CIO and the Washington State Building and Construction Trades Council, AFL-CIO.

2

No. 99031-0 (consol. with 99032-8)

FACTS

Tradesmen Citations

Tradesmen contracted with Dochnahl Construction to provide temporary workers on an as-needed basis. Under the contract, Tradesmen had exclusive responsibility to pay wages and was obligated to provide compensation, including wages and benefits, taxes, unemployment insurance, and workers' compensation insurance. Per the contractual agreement, the host employer, Dochnahl, was "solely responsible for directing, supervising and controlling Tradesmen employees as well as their work." Tradesmen Admin. Record (No. 79634-8-I) (T-AR) at 754.

The contract included a safety clause stating:

Client [Dochnahl] agrees to provide Tradesmen workers a safe work environment that complies with all applicable Federal OSHA [Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651-678] and/or equivalent state agency standards. Client agrees to provide Tradesmen workers any specific safety training and/or equipment required for their work assignment, exclusive of boots, hard hats and safety glasses. Client [Dochnahl] will ensure Tradesmen workers wear all required safety equipment, as well as inspect, maintain and replace this equipment as needed. Client [Dochnahl] agrees to notify Tradesmen immediately in the event of an accident or medical treatment of any Tradesmen worker. Client [Dochnahl] will provide Tradesmen a completed supervisor report of the accident/medical treatment, and Tradesmen shall have the right to conduct an onsite investigation with Client cooperation.

T-AR at 754.

3

No. 99031-0 (consol. with 99032-8)

In April 2016, Tradesmen assigned a temporary worker to a Dochnahl jobsite on Federal Avenue in Seattle. Prior to his assignment, a field representative of Tradesmen inspected the Federal Avenue site for safety hazards and did not identify any concerns. If Tradesmen had identified a hazard, the field representative testified that the Tradesmen worker would not be allowed to continue working without changes. The Tradesmen field representative checked in with the workers via phone and instructed workers to contact him with safety concerns.

Dochnahl reassigned the worker to a different jobsite on Palatine Avenue in Seattle. The Tradesmen field representative testified that under a verbal agreement, the host employers agreed to notify Tradesmen if a temporary worker was relocated to another work site. He testified that host employers often called and notified him about relocating Tradesmen workers. In this instance, Dochnahl did not notify Tradesmen of the change, as a result, Tradesmen did not inspect the Palatine work site.

The Department received a referral regarding the Palatine work site and sent William Keely to the site. Keely identified an unsafe trench and scaffolding on-site. The Tradesmen worker was working near the hazards. The Department cited

No. 99031-0 (consol. with 99032-8)

Tradesmen for two serious WISHA violations, stemming from the worker's exposure to scaffold hazards and the lack of fall protection.[2]

On appeal, the Board agreed with the ruling of the industrial appeals judge (IAJ) that Tradesmen was not a liable employer. The Board cited a lack of control over the worker and work environment. Specifically, the Board found

> 2. . . . . [u]nder the agreements the client is solely responsible to direct and supervise the workers provided by Tradesmen and their work; to provide the worker with safety training specific to the work being done; to provide a safe work environment that complies with all applicable state and Federal health and safety standards . . . .
> 3. Tradesmen inspects each worksite to which it is informed that its workers are dispatched to ensure compliance with applicable safety and health laws, and will direct that corrections to any safety and health problems it discovers be effected.

T-AR at 10. The Board found that Tradesmen did not control the Tradesmen worker, the work he was performing, the Palatine work site, or the work environment.

The Department appealed to the superior court. The superior court affirmed the Board's decision and vacated the citations. The Court of Appeals affirmed, applying the "economic realities" test articulated in *Potelco, Inc. v. Dep't of Labor & Indus.*, 191 Wn. App. 9, 30-31, 361 P.3d 767 (2015).

Laborworks Citations

---

[2] Dochnahl was a subcontractor on the Palatine site, the general contractor was JAS Design Build. Both Dochnahl and JAS were also cited for the WISHA violations.

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99031-0 (consol. with 99032-8)

Laborworks contracted with Strategic to provide temporary workers to sort recycling and waste at Strategic's recycling plant. The workers at Strategic sorted various materials, which could include glass and needles. Under the contract, Laborworks hired and on-boarded the workers, paid the wages, and provided benefits, paid taxes, provided unemployment insurance, and workers' compensation. The host employer, Strategic, was required to "[p]roperly supervise, control, and safeguard its premises, processes, or systems." Laborworks Admin. Record (No. 79717-4-I) (L-AR) at 504. Strategic was also obligated to

> [p]rovide [Laborworks] [e]mployees with a safe work site, comply with all governmental laws as they may apply, including but not limited to the Occupational Safety and Health Act of 1970 (OSHA), . . . and provide appropriate information, training, and safety equipment with respect to any hazardous substances or conditions to which they may be exposed at the work site.

L-AR at 504. Strategic could not change the workers' job duties without Laborworks' approval.

Laborworks provides a general labor and industries blood-borne pathogens online training to the temporary workers and no additional safety trainings. Laborworks performs a jobsite safety evaluation before workers are assigned to the potential host employer. Laborworks walks through the potential work site with the host employer to ensure that the site is a safe work environment. During the evaluation, Laborworks inquired about safety precautions including the use of equipment, the need for personal protective equipment, and the existence of any

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

accident prevention programs. At the initial Strategic safety evaluation, Laborworks noted that the workers would be exposed to blood-borne pathogens. It also noted that the workers required safety equipment such as safety glasses, boots, masks, vests, hearing protection, gloves, and hard hats.

Laborworks also performs on-site safety evaluations after reported injuries. Laborworks will discuss the incident with the client and can suggest corrective actions. The Laborworks human resources and safety manager testified that this was a collaborative process with the client and that the client ultimately makes the decision regarding corrective actions. If Laborworks disagrees with the client's decision, they can pull their workers from the site. Other than these visits, Laborworks does not send representatives to jobsites. Once the workers were at the assigned site, Laborworks could not direct workers to use certain equipment or control the methods and processes of the work.

Laborworks offered the temporary employees hepatitis B vaccinations for the risk of blood-borne pathogen exposure. The Laborworks manager testified that hepatitis B vaccines must be offered to the employees, but they did not necessarily need to be offered by Laborworks. At the Board hearing, the Laborworks safety and human resources manager testified that besides the vaccination records, Laborworks maintained health information only regarding workers' compensation

No. 99031-0 (consol. with 99032-8)

or injuries. Laborworks was also aware of a prior incident in February 2016 where another Laborworks worker was poked by a sharp while at Strategic.

In August 2016, the Department performed an inspection of the Strategic plant and discovered that Laborworks temporary workers were being exposed to blood-borne pathogen hazards. The Department discovered that a Laborworks worker was poked by a needle in July 2016. After interviewing Laborworks management and temporary workers, the inspector discovered that several temporary workers worked several months without receiving blood-borne pathogens training and were not screened for hepatitis B. Some workers had not either received a hepatitis B vaccination or submitted a vaccine declination statement. Laborworks kept incomplete documentation of vaccine history or declination for the workers assigned to Strategic.

Laborworks received five violation citations after the inspection.[3] An IAJ upheld the citations, finding that Laborworks was a liable employer. The Board reversed and vacated the citations, finding that Laborworks was not a liable employer because it did not control the workplace. Specifically, the Board found that

---

[3] Laborworks was cited for failing to make hepatitis B vaccinations available to all workers, failing to ensure that workers who declined vaccination signed a declination statement, failing to provide reasonable safety equipment to protect from sharps exposure, providing inadequate blood-borne pathogens training, and keeping inadequate medical records.

8

No. 99031-0 (consol. with 99032-8)

  4. . . . . LaborWorks paid workers' compensation, unemployment insurance, and wages for workers it provided to Strategic, but Strategic determined the base wage rate. LaborWorks also provided initial training to workers it sent to Strategic but performed no random site checks at the premises.

  5. Both LaborWorks and Strategic maintained the right to terminate workers. However, Strategic exerted daily control over the employees by assigning work and providing supervision over the LaborWorks workers.

L-AR at 7-8. Based on these facts, the Board concluded that Laborworks was not an employer under the economic realities test and vacated the citations.

The Department appealed to the superior court, which reversed the Board decision and reinstated the citations. The superior court ruled that Laborworks was an employer for WISHA purposes. The Court of Appeals reversed and vacated the citations. *Dep't of Labor & Indus. v. Laborworks Indus. Staffing Specialists, Inc.*, No. 79717-4-I (Wash. Ct. App. Aug. 17, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/797174.pdf. It applied the "economic realities" test from *Potelco*, 191 Wn. App. at 30-31, and determined that Laborworks was not a liable employer.

## ANALYSIS

These cases involve a joint employer arrangement, where temporary workers are employed by a staffing agency and perform work for a host employer. The parties do not dispute the existence of an employment relationship between the workers and staffing agencies. Rather, the issue here is whether in a joint

9

No. 99031-0 (consol. with 99032-8)

employment context, staffing agencies may be liable employers for safety violations under WISHA.[4]

In WISHA appeals, we review the Board's findings of fact and determine whether they are supported by substantial evidence and whether those factual findings support the conclusions of law. Review is limited to the examination of the record before the Board; we will not reweigh the evidence. *Potelco*, 191 Wn. App. at 22. WISHA statutes and regulations are to be interpreted liberally to achieve their purpose of providing safe working conditions for every worker in Washington. *Erection Co. v. Dep't of Labor & Indus.*, 160 Wn. App. 194, 202, 248 P.3d 1085 (2011).

WISHA's purpose is to assure "safe and healthful working conditions" for workers in Washington. RCW 49.17.010. Under WISHA, employers "(1) [s]hall furnish . . . a place of employment free from recognized hazards that are causing or likely to cause serious injury or death to [their] employees . . . and (2) [s]hall comply with [WISHA] rules, regulations, and orders." RCW 49.17.060. For

---

[4] In February 2021, the legislature passed Substitute House Bill 1206. The new statute establishes specific obligations for each employer in joint employment arrangements. LAWS OF 2021, ch. 37, § 1. Under the statute, among other things, staffing agencies are responsible for inquiring about safety and health hazards and providing training. If the staffing agencies become aware of existing unmitigated hazards, they must notify the work site employer, urge the work site employer to correct the hazards, and document these efforts, otherwise they must remove the workers from the site. Work site employers are required, in part, to provide specific training tailored to workplace hazards, maintain site-specific training records, and inform the staffing agencies if workers are relocated to sites with new hazards. The statute took effect on July 25, 2021.

10

No. 99031-0 (consol. with 99032-8)

WISHA purposes, an "employer" is defined as any entity that engages in business and employs one or more employees. RCW 49.17.020(4).

In determining employer liability under WISHA, the Board has held that whether a staffing agency "should be cited for WISHA violations depends on the economic realities of who controls the workplace." *In re Skills Res. Training Ctr.*, No. 95 W253, at 3 (Wash. Bd. of Indus. Ins. Appeals Aug. 5, 1997), http://biia.wa.gov/do/95w253_ord_19970805_do.pdf. The Board reasoned that both the staffing agency and host employer "cannot be cited unless they both have substantial control over the workers and the work environment involved in the violations." *Skills Res. Training Ctr.*, No. 95 W253, at 3.

The Board relied on federal OSHA law and has adopted what is referred to as the economic realities test. To determine which employer should be cited, the Board considers specific factors:

1) who the workers consider their employer;
2) who pays the workers' wages;
3) who has the responsibility to control the workers;
4) whether the alleged employer has the power to control the workers;
5) whether the alleged employer has the power to fire, hire, or modify the employment condition of the workers;
6) whether the workers' ability to increase their income depends on efficiency rather than initiative, judgment, and foresight; and
7) how the workers' wages are established.

11

*Skills Res. Training Ctr.*, No. 95 W253, at 7. In that case, the inquiry focused on whether the putative employer had "the right to control the work force." *Skills Res. Training Ctr.*, No. 95 W253, at 7.

The Court of Appeals in *Potelco* adopted and applied the Board's economic realities test. 191 Wn. App. at 30-31. The court noted that the key consideration was whether the putative employer has the right to control the worker. The issue in *Potelco* was whether the host employer was liable for WISHA violations involving temporary workers from a staffing agency. The court analyzed the seven economic realities factors, ultimately finding substantial evidence supported the conclusion that the host employer controlled both the workers and the work sites. The host employer there was liable for the WISHA violations. *Potelco*, 191 Wn. App. at 33.

The Department contends that WISHA employer liability inquiry should follow the approach taken in *Becerra Becerra v. Expert Janitorial, LLC*, 181 Wn.2d 186, 332 P.3d 415 (2014). *Becerra* involved joint employer liability under the Minimum Wage Act (MWA), ch. 49.46 RCW, for minimum wage and overtime requirements. In that case, the plaintiffs were janitorial workers directly employed by second-tier service providers and then subcontracted by another company, Expert, to provide janitorial services at Fred Meyer stores. To determine whether Expert and Fred Meyer were employers under the MWA, we relied on the parallel Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201-219,

12

No. 99031-0 (consol. with 99032-8)

jurisprudence. Both the MWA and FLSA include broad definitions of the requisite employment relationship. We noted that the FLSA definition of "employ" is broader than the common law definition and includes "'working relationships, which prior to [the FLSA] were not deemed to fall within an employer-employee category.'" *Becerra*, 181 Wn.2d at 195 (alteration in original) (internal quotation marks omitted) (quoting *Ling Nan Zheng v. Liberty Apparel Co*., 355 F.3d 61, 69 (2d Cir. 2003)). We applied an economic reality test with five formal or regulatory factors, which included

> "[1] The nature and degree of control of the workers;
> "[2] The degree of supervision, direct or indirect, of the work;
> "[3] The power to determine the pay rates or the methods of payment of the workers;
> "[4] The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; [and]
> "[5] Preparation of payroll and the payment of wages."

*Becerra*, 181 Wn.2d at 196-97 (fifth alteration in original) (internal quotation marks omitted) (quoting *Torres-Lopez v. May*, 111 F.3d 633, 639-40 (9th Cir. 1997)). We also articulated eight additional common law factors, which included permanence of the working relationship, whether the work was specialized, and whether the employees had their own business and used their own equipment. We determined that these were nonexclusive factors to be used to determine whether a joint employment relationship exists under minimum wage statutes. Notably, as the Court of Appeals in that case concluded, additional factors could be considered,

13

including whether the putative joint employer had knowledge of the wage and hour violation. In that case, we reversed summary judgment dismissal and remanded for further consideration of all relevant factors. *Becerra*, 181 Wn.2d at 196-200.

The determination of employer liability differs by statute, so while the staffing agencies may be liable employers for the purposes of the MWA, that may not translate to liability under WISHA. *See also MLB Indus., Inc.*, 12 BNA OSHC 1525, 1527 (No. 83-231, 1985) (noting that the employment relationships are based on the specific statute's purpose and policy). We decline to fully adopt the approach taken in *Becerra* here because not all the considerations are relevant. For instance, the eight additional common law factors articulated in *Becerra* are not particularly relevant to a joint employment arrangement because the staffing agencies do not dispute the existence of an employment relationship with the temporary workers; rather, they dispute liability under WISHA. However, there are similarities between the MWA and WISHA liability inquiries. The five regulatory or formal factors articulated in *Becerra* are consistent with those identified and applied in the economic realities test, particularly the factors of control over the worker and work conditions.

The Department argues that the WISHA inquiry should focus on the level of control over the workers and additional factors such as knowledge of the violation and permanence of employment relationship as opposed to control over the

14

physical work site. Under WISHA, control is an appropriate factor to consider in determining employer liability. Specifically, we inquire into the putative employer's right to control both the workers and the physical work environment, which includes work conditions and the work site.

In *Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 788 P.2d 545 (1990), the issue was whether a general contractor had a duty to comply with WISHA regulations. We held that under WISHA, "general contractor[s] should bear the primary responsibility for compliance with safety regulations because the general contractor's innate supervisory authority constitutes *sufficient control over the workplace*." *Stute*, 114 Wn.2d at 464 (emphasis added). In that case, an employee of a subcontractor was injured on a work site and sued the general contractor for noncompliance with WISHA regulations. Based on the WISHA statutes and regulations, we held that WISHA employer liability is not tied to an employment relationship; liability may extend beyond direct employees to include all employees on a jobsite. *Stute*, 114 Wn.2d at 460.

To determine the extent of such an employer's liability, we focus on and assess the element of control. The concept of control was derived from a common law exception to employer liability, where generally employers are not liable for independent contractors unless the employer retains some control over the work. *Stute*, 114 Wn.2d at 460. In *Stute*, we noted that even in pre-WISHA cases, courts

15

No. 99031-0 (consol. with 99032-8)

assessed the employer's control over work conditions, including general supervisory functions, to determine general contractor liability. We also reasoned that subcontractors lack the supervisory authority of general contractors and will not be liable unless the subcontractor was in control of or created the dangerous condition. We reasoned that the general contractors are in the best position to ensure compliance with safety regulations and, based on this, should be primarily responsible for compliance because of their supervisory authority and economic ability to control the work, site, and work conditions. *Stute*, 114 Wn.2d at 461-62.

Similarly, in a different situation, we evaluated whether the jobsite owners retained sufficient control over work conditions to establish a duty under WISHA. In *Kamla v. Space Needle Corp.*, we concluded that jobsite owners may have a duty to comply with WISHA regulations where they retain the control over the manner in which a contractor completes its work. 147 Wn.2d 114, 124-25, 52 P.3d 472 (2002). Additionally, in *Afoa v. Port of Seattle*, 176 Wn.2d 460, 472, 296 P.3d 800 (2013), we held that "jobsite owners have a specific duty to comply with WISHA regulations if they retain *control over the manner and instrumentalities of work* being done on the jobsite." (Emphasis added.) Notably, this duty may exist regardless of any direct employment relationship; instead under WISHA responsibility is placed on the entity best able to ensure workplace safety. *Afoa*, 176 Wn.2d at 479.

16

No. 99031-0 (consol. with 99032-8)

Control over the workers and control over the work environment are central to determining employer liability under federal OSHA. Since WISHA is parallel to and supplements federal OSHA, we often look to federal cases interpreting OSHA as persuasive authority. OSHA's purpose is to assure that every worker has "safe and healthful working conditions." 29 U.S.C. § 651(b). To determine employer liability, consistent with OSHA's purpose, the Occupational Safety and Health Review Commission (Commission) places "primary reliance upon who has control over the work environment such that abatement of the hazards can be obtained." *MLB*, 12 BNA OSHC at 1527.

For example in *MLB*, the Commission resolved whether a company that provided labor to another company could be liable for OSHA violations. The Commission acknowledged the use of a five-factor test, which is consistent with the approach adopted in *Skills Resource Training Center* and *Potelco*, to help determine control over the work environment.[5] *MLB*, 12 BNA OSHC at 1526-27. The Commission held that the factors related to the issue of who controls the work environment and workers should be given particular emphasis when determining

---

[5] The Commission generally considers five factors to determine employer status under OSHA:
  "1. Whom the employee considers to be his or her employer;
  "2. Who pays the employee's wages;
  "3. Who is responsible for controlling the employee's activities;
  "4. Who has the power as opposed to the responsibility to control the employee; and
  "5. Who has the power to fire the employee or to modify the employee's employment conditions." *MLB*, 12 BNA OSHC at 1526-27.

17

No. 99031-0 (consol. with 99032-8)

employer liability under OSHA because those factors give effect to the remedial purpose of OSHA. These factors include responsibility for controlling worker activities, power to control the employee, and power to fire or modify work conditions. The Commission expressly stated that the other two considerations—who pays wages and the worker's belief of employment—have some bearing but are not directly related to the issue of control and thus should "be accorded less emphasis in determining the employment relationship under" OSHA. *MLB*, 12 BNA OSHC at 1528. The Commission emphasized that the five factors are not exclusive and that the determination is made on a case-by-case basis.

In *Froedtert Memorial Lutheran Hospital Inc.*, 20 BNA OSHC 1500, 1506 (No. 97-1839, 2004), the Commission determined that a host employer was liable for OSHA violations involving temporary workers from a staffing agency because it controlled the manner and means of their work activities. There, the Commission applied the 12 *Darden* factors, which are derived from the common law of agency, to be considered in determining an employment relationship under OSHA.[6] The

---

[6] The *Darden* factors were articulated by the United States Supreme Court as an adoption of the common law test for determining an employee under the Employee Retirement Income Security Act of 1974, 88 Stat. 834, 29 U.S.C. § 1002(6). "'In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party;

18

No. 99031-0 (consol. with 99032-8)

Commission recognized that control over the worker remains a "principal guidepost" in determining liability. *Froedtert Mem'l*, 20 BNA OSHC at 1506.

Both control of the workers and control of the physical work environment are primary considerations in determining employer liability under WISHA and OSHA. We allocate responsibility to the entities best able to ensure a safe working environment and protect workers. *Afoa*, 176 Wn.2d at 479. In the joint employment context, both the staffing agency and the host employer may be cited if they possess substantial control over the workers and the work environment involved in the violations. *Skills Res. Training Ctr.*, No. 95 W253, at 9. To determine liability under WISHA, where the putative employer is a staffing agency, the inquiry includes whether the agency had sufficient control over the workers and work environment to abate the relevant safety hazards. In doing so, we consider the relevant safety hazard involved in the violation and determine the putative employer's level of control over the manner and instrumentalities of the work being performed, control over the workers, control over work conditions on site, and the ability to abate the relevant hazards. This determination is made on a case-by-case basis.

---

whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989)).

No. 99031-0 (consol. with 99032-8)

The economic realities factors stated in *Potelco* and *Skills Resource Training Center* offer helpful, nonexclusive factors to assess the level of control exercised by the putative employer. The factors more closely related to control are given more emphasis because they are directly tied to WISHA's remedial purpose of ensuring safe and healthful working conditions. *MLB*, 12 BNA OSHC at 1527. Such key factors include who has responsibility and power to control the workers and work site and whether the alleged employer has the power to hire, fire, or modify the employment conditions. This is particularly true in the joint employment context where the putative employer is the primary employer as opposed to the host employer.

The Department contends that whether the putative employer knew or should have known of the hazard is a relevant consideration in determining liability because "[k]nowledge gives the employer the ability to demand correction of the hazard or remove the worker." Suppl. Br. (Corrected) Dep't of Labor & Indus. at 17. Given that the economic realities test articulates nonexclusive factors, knowledge of a hazard may be a relevant consideration where it is paired with some level of control and ability to abate the relevant hazard. In *Kamla*, we held that jobsite owners did not have a per se duty to comply with WISHA regulations because they "may not have knowledge about the manner in which a job should be performed or about WISHA compliant work conditions, [so] it is unrealistic to

20

No. 99031-0 (consol. with 99032-8)

conclude all jobsite owners necessarily control work conditions." 147 Wn.2d at 124. It follows that where an employer knows or should have known of a hazard and has some relevant control over the workers and related work conditions, liability may be appropriate.

This is consistent with the Department's Dual Employers and DOSH (Division of Occupational Safety and Health) Enforcement Directive 1.15 (Directive), under which the primary employer (staffing agency) may be cited for a WISHA violation if they "had knowledge or clearly should have had knowledge of the violation."[7] But even with sufficient knowledge, the agency could not be cited if they took reasonable steps to abate the hazard, if they lacked direct control over the work site and were "unable to bring about immediate hazard correction," and if the hazard was not an imminent danger situation. Directive at 5. The *Tradesmen* Court of Appeals rejected the Directive because it was not promulgated under the rule-making requirements of the Administrative Procedure Act, ch. 34.05 RCW, and is more appropriately characterized as an "advisory" policy statement. *Tradesmen Int'l*, 14 Wn. App. 2d at 177; *see J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus.*, 139 Wn. App. 35, 52-53, 156 P.3d 250 (2007). Such directives play a significant role in notifying the public and stakeholders about the agency's current

---

[7] Wash. Dep't of Labor & Indus., Div. of Occupational Safety & Health, Directive 1.15, at 5 (Feb. 15, 2019), https://www.lni.wa.gov/dA/96edf1ea0f/DD115.pdf [https://perma.cc/GA2K-QXNN].

21

No. 99031-0 (consol. with 99032-8)

approaches, practices, and procedures. While the directive is not a formal rule, it provides helpful guidance. Further, it is consistent with WISHA and OSHA jurisprudence by recognizing that knowledge may be a relevant factor when connected to the element of control.

Applying that approach here, the inquiry is whether the staffing agencies retained substantial control over the workers and work environment such that they could abate the relevant safety hazards. We consider factors such as the power to control the worker, the ability to modify work conditions and status, control over the work site, and the level of knowledge of the relevant safety hazard.

Tradesmen

In the case of Tradesmen, the agency was cited for a temporary worker's exposure to fall and scaffold hazards at the Palatine work site. The Board expressly found that Tradesmen did not control the temporary worker, the work being performed, the Palatine work site, or the work environment. These findings are supported by substantial evidence.

Under the contractual agreement between Tradesmen and the host employer, the host employer was responsible for providing a safe work environment, safety training, and safety precautions. Tradesmen was responsible for paying wages, determining compensation, and handling taxes, unemployment insurance, and workers' compensation. The host employer was also "solely responsible for

22

directing, supervising and controlling Tradesmen employees as well as their work." T-AR at 754. Regarding the level of control exercised over the worker and work environment, Tradesmen performed an initial on-site safety inspection at the original work site. Once the work site was approved and the workers were assigned, a Tradesmen field representative occasionally checked in with the workers via phone. After the initial inspection, there was no evidence that Tradesmen actively supervised the workers, controlled the methods of work or work conditions, or provided on-site supervision. The WISHA citations involved work site infrastructure at the Palatine jobsite. First, a violation of former WAC 296-155-24609 (2016), *repealed by* Wash. St. Reg. 20-12-091 (2020), which requires a guardrail system and when appropriate, toe boards, on ramps, runways, or inclined walkways that are at least four feet above the ground. Second, a violation of WAC 296-874-20002(1)(a), which requires a qualified person to design work site scaffolding. Tradesmen did not inspect the Palatine work site for safety hazards because the host employer failed to notify Tradesmen of the relocation. As a result, Tradesmen had no ability to identify or abate the fall and scaffolding hazards at the unapproved site. The infrastructure-related violations were simply beyond the purview of Tradesmen's control. Substantial evidence

supports the Board's findings, and we affirm the Court of Appeals. Tradesmen is

not a liable employer for these WISHA violations.[8]

Laborworks

In contrast to the Tradesmen citations, which involved jobsite infrastructure

hazards, the Laborworks citations do not directly involve jobsite safety issues.

Although the Department discovered that a Laborworks worker was poked by a

sharp object while working at the host employer's recycling plant, Laborworks was

cited by the Department for WISHA violations involving the provision of

vaccinations, implementing proper safety equipment for sharp object exposure,

inadequate safety training, and inadequate medical recordkeeping.

The Board found that Laborworks paid workers' compensation,

unemployment insurance, and wages, but the host employer determined the wage

rate; Laborworks provided initial training to the workers but did not perform

random jobsite safety checks; and while both employers maintained the right to

terminate workers, the host employer exerted daily control over the workers by

---

[8] In 2021, the legislature significantly revised chapter 49.17 RCW, adding a new section (1). These revisions, although not at issue here, expand and make specific staffing agency duties to its employees, requiring a higher responsibility for jobsite safety violations.

The concurrence/dissent notes the revisions but fails to acknowledge the changes that expand staffing agency duties for jobsites not under their control, and for potential expansive safety violation responsibility. Concurrence/dissent at 13 n.5. Under the statutory version at issue here, as explained herein, control over the jobsite is a necessary factor to assign responsibility for a jobsite safety violation. To conclude otherwise, as the concurrence/dissent does, paradoxically suggests these statutory revisions–which indicate a change in policy–were entirely unnecessary.

assigning work and providing supervision. Unlike in *Tradesmen*, the Board did not expressly find that Laborworks lacked control over the workers or work environment. Yet, the Board concluded that Laborworks was not a liable employer and vacated the citations. The Board's findings do not support its legal conclusion.

While the Board properly found that the host employer exerted control over the workers via assignments and supervision, the citations involved conditions that were within Laborworks' control. Laborworks received five citations concerning its failure to adequately *prepare* the workers for the work assignment. The preparation of workers was Laborworks' responsibility and required actions generally taken before the work assignment. The first citation involved a violation of WAC 296-823-13005(1), which requires employers to make hepatitis B vaccinations "available to all employees who have occupational exposure" and to maintain a declination statement for those who decline the vaccine. The second citation involved WAC 296-823-14005(2), which requires employers to "use work practices designed to eliminate or minimize employee exposure" to hazards. The third citation concerned training for workers with occupational exposure; WAC 296-823-12005(5) outlines specifics elements—including education about blood-borne pathogens—that must be incorporated into the training program. The final two citations involved WAC 296-823-17005(1) and WAC 296-823-12015(1),

No. 99031-0 (consol. with 99032-8)

which mandate employers to maintain accurate medical and training records. The training records must be maintained by the employer for three years.

In this case, Laborworks was responsible for the administrative tasks of hiring and onboarding workers, paying wages, and providing workers' compensation, unemployment insurance, and benefits per the contractual agreement. Laborworks inspected the work site and identified blood-borne pathogen hazards. The human resources and safety manager testified that Laborworks provided workers a limited safety training regarding the exposure to blood-borne pathogens. Laborworks also maintained some medical and training records and offered hepatitis B vaccines to some workers. While Laborworks did not have control over the daily operations and supervision at the work site, it had the right to—and exercised—control over the provision of vaccinations, training, and recordkeeping to prepare the workers for the temporary job assignment.

The violations in this case are less related to the on-site presence of sharps than to the preparation of workers for their temporary job assignments. WAC 296-823-12015(1) requires employers to keep training records for three years, and WAC 296-823-17005(1) requires employers to maintain medical records; these are tasks within the control of the staffing agency rather than the host employer. Laborworks is responsible for maintaining accurate records of their workers, especially records requiring years-long maintenance. The remaining violations also

26

No. 99031-0 (consol. with 99032-8)

concerned safety precautions—training and vaccinations—that should be provided to workers before or near the assignment to the jobsite. WAC 296-823-12005(2)(a) requires employers to provide training "[b]*efore* assigning tasks where occupational exposure might occur." (Emphasis added.) WAC 296-823-13005(1)(f) also specifies that hepatitis B vaccinations should be provided to workers after they receive training and "within ten working days of initial assignment." The regulations indicate that these safeguards should occur before or upon the worker's assignment. Thus, Laborworks, as the primary employer, is responsible for performing these safeguards before the worker is assigned or upon assignment to the host employer.

Finally, Laborworks knew that a worker had been poked by a sharp object while sorting materials a few months before. Laborworks was aware of the potential exposure and was required to take some action to abate the hazard. When another worker was poked, Laborworks was cited for the failure to implement feasible controls for workers who handle sharps under WAC 296-823-14005(2).[9] Although Laborworks did not provide on-site supervision or daily control over the methods of work, it had notice of the prior incident and an opportunity to correct it

---

[9] This citation in particular involves a work site condition, in which Laborworks had only a limited amount of control. However, neither Laborworks nor the Department distinguishes liability specific to each citation. Regardless, Laborworks had actual knowledge and some level of control over its workers' handling of sharps.

27

in coordination with the host employer. If not, Laborworks should have removed the workers from the unsafe conditions.

Ultimately, Laborworks exercised substantial control over the workers and conditions—particularly, before the workers were assigned to the Strategic work site. The citations in this case involved responsibilities that are generally taken before or upon the commencement of the job assignment and recordkeeping requirements. The Board found that Laborworks was responsible for administrative tasks and providing initial training. These facts support the conclusion that Laborworks was a liable employer for the WISHA violations in this case. We reverse the Court of Appeals and reinstate the WISHA citations against Laborworks.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99031-0 (consol. with 99032-8)

_____
Johnson, J.

WE CONCUR:

_____          _____
Madsen, J.

_____          _____
Owens, J.

_____          _____
Stephens, J.                             Whitener, J.

29

No. 99031-0
(consolidated with 99032-8)

GONZÁLEZ, C.J. (concurring/dissenting)—Under our constitution the legislature shall pass laws to protect workers in "employments dangerous to life or deleterious to health." WASH. CONST. art. II, § 35. Our legislature has done so, passing the Washington Industrial Health and Safety Act of 1973 (WISHA) to "assure, insofar as may reasonably be possible, safe and healthful working conditions" for every worker in our state. RCW 49.17.010. Our state has taken great strides to protect workers from known dangers through law, regulation, education, and enforcement. Ch. 49.17 RCW; Title 296 WAC.

But we know that temporary workers across our state are far more likely than those with traditional, permanent jobs to be injured on the job. *See* Michael Foley, *Factors Underlying Observed Injury Rate Differences Between Temporary Workers and Permanent Peers*, 60 AM. J. INDUS. MED. 841, 844 (2017). The analysis of whether a temporary staffing agency is an employer for WISHA purposes should be informed by our constitutional directive and legislative policy that workers should have safe working conditions. WASH. CONST. art. II, § 35; RCW 49.17.010. Staffing agencies have considerable control over temporary workers even if these agencies do not control the physical work site. Under our

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

economic realities test, I agree with the majority that Laborworks was

appropriately cited as an employer under WISHA. I disagree that Tradesmen was

not. Accordingly, I respectfully concur in part and dissent in part.

"Employer" is not clearly defined under WISHA. *See* RCW 49.17.020(4).

Over the years, courts have developed a multifactor economic realities test to

determine when a temporary staffing agency is an employer for purposes of health

and safety responsibilities. Like the majority, I would continue to use this seven-

factor test.[1] Majority at 11 (citing *In re Skills Res. Training Ctr.*, No. 95 W253, at

7 (Wash. Bd. of Indus. Ins. Appeals Aug. 5, 1997),

http://biia.wa.gov/DO/95W253_ORD_19970805_DO.pdf). But we should apply it

as a true multifactor test. Treating the factor of control as determinative regardless

of the other factors simply converts a multifactor test into a single one and risks

reverting to the very common law "right-to-control" test that we have long

rejected. *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 869-70,

281 P.3d 289 (2012); *see also Griffin & Brand of McAllen, Inc.*, 6 BNA OSHC

---

[1] After we adopted the economic realities test from federal OSHA (Occupational Safety and Health Administration) cases, the Occupational Safety and Health Review Commission adopted the common law agency test from *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992). *See FreightCar Am. Inc.*, No. 18-0970, at 3 (OSHRC Mar. 3, 2021). This test is focused on "whether a conventional master-servant relationship exists." *Froedtert Mem'l Lutheran Hosp., Inc.*, 20 BNA OSHC 1500, 1505 (No. 97-1839, 2004). We, of course, are not obligated to follow the commission's approach, though I note there is substantial overlap between the two tests. *See, e.g.*, *Don Davis*, 19 BNA OSHC 1477, 1480 (No. 96-1378, 2001).

2

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

1702, 1703 (No. 14801, 1978) (compared to the common law test "known as the

right of control," the economic realities test is "used in applying remedial

legislation that Congress did not intend to be limited to employment relationships

defined by common law principles"). In fact, in *Anfinson*, we rejected a proposed

test as "clearly erroneous" because it prioritized whether the employer

"'controlled, or had the right to control, the details of the [] performance of the

work'" over the economic realities of the employment relationship. 174 Wn.2d at

872. The majority's focus on control has led it to the wrong conclusion.

Under the full test, what matters is the *ability* to control the worker, not

whether the employer actually used that control. *See Griffin*, 6 BNA OSHC at

1704 (under the economic realities test, the "*ability* to fire and discipline" matters,

and the employer "clearly had the *power*" to do so (first emphasis added)). Like in

so many contexts, an employer cannot avoid responsibility by failing to take

responsibility. *See Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 461, 788 P.2d 545

(1990) (for a general contractor, the "test of control is the right to exercise control

and not the actual exercise of control" (citing *Kelley v. Howard S. Wright Constr.*

*Co.,* 90 Wn.2d 323, 330-31, 582 P.2d 500 (1978))); *see also Kamla v. Space*

*Needle Corp.*, 147 Wn.2d 114, 121, 52 P.3d 472 (2002) (jobsite owners may be

liable for injured independent contractors when "there is a retention of the right to

direct the manner in which the work is performed, not simply whether there is an

3

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.*, No. 99032-8
(González, C.J., Concurring/Dissenting)

actual exercise of control over the manner in which the work is performed"). As

the majority properly recognizes, this is reflected in the language of the economic

realities test. Majority at 11 (listing factors including "who has the *responsibility

to control* the workers," whether the employer "*has the power to control* the

workers," and "whether the alleged employer has *the power* to fire, hire, or modify

the employment condition of the workers" (emphasis added)).

An employer's ability to control its workers, whether directly or indirectly,

should not be limited to the ability to control the *work site.* That is simply not a

limitation that appears in our economic realities test. I recognize that several cases

held that physical control of a work site is particularly significant. *See, e.g.*, *In re

Skills Res. Training Ctr.*, No. 95 W253, at 3 ("Both employers cannot be cited

unless they both have substantial control over the workers and the work

environment involved in the violations."); *MLB Indus.*, 12 BNA OSHC 1525, 1527

(No. 83-231, 1985) (placing "primary reliance upon who has control over the work

environment such that abatement of the hazards can be obtained").[2] But these

---

[2] *In re Skills Resource Training Center*, which first used the economic realities test for WISHA,
may have focused on the work site due to the unique facts of that case, where the staffing agency
"operated as a human resources department" for the secondary employer after the staffing
agency contracted to hire *all* of the secondary employer's employees. No. 95 W253, at 4. That
arrangement, often referred to as "leasing," is distinct from the situation here where staffing
agencies send workers on shorter-term assignments to multiple workplaces. Edward A. Lenz,
*Co-Employment—A Review of Customer Liability Issues in the Staffing Services Industry*, 10
LAB. LAW. 195, 198 (1994) ("leasing is different from temporary help or staffing . . . [it] involves
the placement by an employer of all or most of its work force onto the payroll of an employee

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

cases have shifted away from the original intent of both the common law "control"

test and the economic realities test. *See Nat'l Labor Relations Bd. v. Hearst*

*Publ'ns, Inc.*, 322 U.S. 111, 131-32, 64 S. Ct. 851, 88 L. Ed. 1170 (1944)

(foundational case determining that "newsboys" who sell newspapers on public

streets are employees given the economic relationship of their work); *see also*

*Griffin*, 6 BNA OSHC at 1703 (an entity is an employer under the common law

control test if it "controls both the *results of work* and the *means by which workers*

*accomplish the result*" and under the economic realities test if it has "the power to

control the *workers*" (emphasis added)).

I disagree with the majority that cases involving the allocation of

responsibility in multiemployer construction work sites are instructive. These

cases generally impose liability on the entities with control of the work site

because entities with control are in the best position to mitigate risks on a

---

leasing firm . . . to 'outsource' . . . human resources activities"). While our case law makes this distinction, I urge courts and practitioners to stop describing the relationship as "leasing." *See* Letter from Wash. State Supreme Court to Members of Judiciary & Legal Cmty. 1 (June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%Legal %20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7]. "Lease" is defined as granting "the possession and use of (land, buildings, rooms, movable property, etc.) to another in return for rent or other consideration," which specifically refers to property, not people. BLACK'S LAW DICTIONARY 1068 (11th ed. 2019). Using the term to describe an employment relationship is dehumanizing and is associated with convict leasing, which "entrap[ped] former slaves in a cycle of coerced labor." Tamar R. Birckhead, *The New Peonage*, 72 WASH. & LEE L. REV. 1595, 1658 (2015).

5

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

construction site. *See Stute*, 114 Wn.2d at 464 ("general contractor[s] should bear

the primary responsibility for compliance with safety regulations because the

general contractor's innate supervisory authority constitutes sufficient control over

the workplace"). These cases often arise when a worker, hired by a subcontractor,

is injured at a jobsite due to the fault of the general contractor or jobsite owner.

But these cases arise under different legal theories, and liability is not dependent

on an employment relationship. *Id.* at 460; *see also Afoa v. Port of Seattle*, 176

Wn.2d 460, 472, 296 P.3d 800 (2013). They simply are not analogous to joint

employment contexts, where two entities share authority and control. *See In re*

*Skills Resource Training Ctr.*, No. 95 W253, at 3 (explaining that joint employer

work sites are distinguishable from multiemployer sites); Wash. Dep't of Labor &

Indus., Div. of Occupational Safety & Health, Directive 1.15, at 1 (Feb. 15, 2019)

("[c]itations related to dual employer situations are distinct and different from

citations issued to general and upper-tier contractors in construction"),

https://www.lni.wa.gov/dA/96edf1ea0f/D115.pdf [https://perma.cc/GA2K-

QXNN].

For joint employers, physical control of a work site is not required to

manage health and safety risks. Staffing agencies are also in positions to prevent,

control, or limit hazards. They do this by imposing safety standards, inspecting

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

work sites, requiring secondary employers to fix hazards, and by not contracting

with clients who place their employees in unsafe sites.

Focusing on a physical work site ignores the reality that work today is highly

mobile, more likely to be virtual, and more likely to include joint employment or

contracting scenarios. Katherine V.W. Stone, *Legal Protections for Atypical*

*Employees: Employment Law for Workers without Workplaces and Employees*

*without Employers*, 27 BERKELEY J. EMP. & LAB. L. 251, 282 (2006) ("The

twentieth century ideal of work has come and gone. . . . No longer is employment

centered on a single, primary employer."). A physical work site is inapplicable for

a temporary worker delivering packages, driving a truck, working remotely, or

cleaning offices in different buildings. As the Department of Labor and Industries

(Department) notes, "If control over the work environment is required, then typical

staffing agencies would rarely, if ever, be considered employers of their own

workers when placed on assignment." Suppl. Br. (Corrected) of Dep't of Labor &

Indus. at 10.

The economic reality "factors are not exclusive and are not to be applied

mechanically or in a particular order." *Becerra Becerra v. Expert Janitorial, LLC*,

181 Wn.2d 186, 198, 332 P.3d 415 (2014); *see also Rutherford Food Corp. v.*

*McComb*, 331 U.S. 722, 730, 67 S. Ct. 1473, 91 L. Ed. 1772 (1947) (the

determination of the employment relationship depends on "the circumstances of

7

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

the whole activity"). This test may include other relevant factors, when applicable,

like the permanency of the employment relationship and the employer's actual or

constructive knowledge of risks. *Becerra*, 181 Wn.2d at 197-98 (considering

factors such as "whether there was 'permanence [in] the working relationship'"

and "whether the putative joint employer knew of the wage and hour violation"

(alteration in original)).

Under this test, both Laborworks and Tradesmen are employers. They paid

the workers; had the ability to hire, fire, and discipline them; paid taxes,

unemployment insurance, and workers' compensation; made safety inspections and

provided training; and partly controlled the job duties and assignments. For

Tradesmen, under the first factor of the economic realities test (who the worker

considers as their employer), that fact is not in the record. However, Tradesmen

hired the worker, placed the worker at the work site, and instructed the worker to

call a Tradesmen supervisor with any issues or questions. Tradesmen Admin.

Record (No. 79634-8-I) (T-AR) at 687, 754. Second, Tradesmen paid the worker's

wages as well as employment taxes and workers' compensation. T-AR at 754;

*Dep't of Labor & Indus. v. Tradesmen Int'l, LLC*, 14 Wn. App. 2d 168, 178, 470

P.3d 519 (2020) ("[t]his factor suggests Tradesmen was an employer with respect

to the citation"). Third, Tradesmen had the ultimate responsibility to control the

workers. While the host employer had day-to-day responsibility to control the

8

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.*, No. 99032-8
(González, C.J., Concurring/Dissenting)

work on-site, Tradesmen had the responsibility to determine where the worker

would work and the terms under which they would work, and the ability to pull a

worker from a site or fire them.  T-AR at 686-87, 739, 754.  Through its contracts,

Tradesmen also provided training, including safety training, indicating a

responsibility to provide a safe workplace.  T-AR at 741-42.  Fourth, Tradesmen

had the power to control the worker by controlling work placement, determining

the terms of work, and restricting the host employer's ability to change working

conditions.  T-AR at 754.  The Court of Appeals determined that the fact that the

temporary worker was moved to a new jobsite without Tradesmen's actual

knowledge shows a lack of control—but Tradesmen had the power to determine

work site placement, so this actually shows a failure on Tradesmen's part to ensure

the worker was where the agency had placed him.  *Tradesmen*, 14 Wn. App. 2d at

179.  Fifth, Tradesmen had the ability to hire, fire, or modify the employment

condition of the workers.[3]  T-AR at 739; *Griffin*, 6 BNA OSHC at 1704 ("The

ability to fire and discipline workers is important in assuring that the quality of

their work will not decline. Consequently, possession of that ability is a strong

indication of the existence of an employer-employee relationship.").  Finally,

---

[3] The sixth factor asks whether the workers' ability to increase their income depends on
efficiency rather than initiative, judgment, and foresight.  This factor is more applicable in a
context where workers are alleged to be independent contractors. *Anfinson*, 174 Wn.2d at 871-
72.  While it is less relevant here, it may be useful in other joint employment situations.

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

Tradesmen established the workers' wages, which the Court of Appeals also noted "supports Tradesmen being an employer."[4]  *Tradesmen*, 14 Wn. App. 2d at 180. Looking to other factors that may be relevant, the worker presumably had a longer employment relationship with Tradesmen when compared to the worksite employer.  And, Tradesmen had constructive knowledge of potential risks at the work site.  Considering all the factors, Tradesmen is clearly a joint employer of the worker at issue here.

The analysis does not end here.  Once an entity is determined to be an employer for WISHA purposes, the second question is whether they are liable under WISHA for a safety violation.  Employers have a nondelegable duty to provide a safe workplace and comply with WISHA regulations.  *Ward v. Ceco Corp.*, 40 Wn. App. 619, 628, 699 P.2d 814 (1985); *Afoa*, 176 Wn.2d at 495.  If the Department charges a "serious" WISHA violation, the Department must prove in part that "'the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition.'"  *Potelco, Inc. v. Dep't of Labor & Indus.*, 191 Wn. App. 9, 21, 361 P.3d 767 (2015) (quoting *Pilchuck Contractors, Inc. v. Dep't of Labor & Indus.*, 170 Wn. App. 514, 518, 286 P.3d 383 (2012)).

---

[4] The majority suggests that who pays wages and the worker's belief of employment should be accorded less weight.  Majority at 17-18 (quoting *MLB*, 12 BNA OSHC at 1528).  I disagree. These factors are significant because they provide strong evidence of an employment relationship and the entity the worker is most likely to contact in case of safety concerns.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

This standard requires an employer to address safety concerns if it knew about

them or could have known through reasonable diligence. *Erection Co. v. Dep't of*

*Labor & Indus.*, 160 Wn. App. 194, 206-07, 248 P.3d 1085 (2011). "'Reasonable

diligence involves several factors, including an employer's obligation to inspect

the work area, to anticipate hazards to which employees may be exposed, and to

take measures to prevent the occurrence.'" *Id.* (internal quotation marks omitted)

(quoting *Kokosing Constr. Co. v. Occupational Safety & Hazard Review Comm'n*,

232 F. App'x 510, 512 (6th Cir. 2007). "Constructive knowledge may be

demonstrated by the Department in a number of ways, including evidence showing

that the violative condition was readily observable or in a conspicuous location."

*Pro-Active Home Builders, Inc. v. Dep't of Labor & Indus.*, 7 Wn. App. 2d 10, 18,

432 P.3d 404 (2018) (citing *Erection Co.*, 160 Wn. App. at 207).

Applying this standard, I agree with the majority that Laborworks was

appropriately cited for WISHA violations. Laborworks clearly qualifies as a joint

employer. But in my view, Tradesmen too was appropriately cited because it had

constructive knowledge of the violations. The majority holds that "Tradesmen had

no ability to identify or abate" the hazards and that the violations were "simply

beyond the purview of Tradesmen's control." Majority at 23. I disagree. These

violations were readily observable and could have been discovered through

reasonable diligence. T-AR at 683 (Tradesmen field representative stated the work

11

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.*, No. 99032-8
(González, C.J., Concurring/Dissenting)

site had an "[o]bvious fall hazard" after being shown photos of the second work

site for the first time). Tradesmen failed to even verify that the employee was at

the work site to which it sent him. Through a quick phone call or a physical

inspection of the work site on the day the worker was assigned there, Tradesmen

could have discovered the violation. Tradesmen supervisors are required to inspect

sites for safety violations and communicate with employees regarding safety

concerns. T-AR at 676-77 (Tradesmen representative stating that he does "what is

called a 'walkout' every time somebody is dispatched to a job site"), 687, 743-44.

Tradesmen knew that workers were often moved to different sites without

notice. T-AR at 681-82; *see Erection Co.*, 160 Wn. App. at 207-08 (holding the

employer liable under a constructive knowledge standard because the safety

violation occurred on occasion in the past). A Tradesmen representative testified

that this happened about once a month. T-AR at 681-82. Through oral agreement,

Tradesmen asked clients to inform them if workers were moved to different sites—

but it did not enforce this in their contracts. T-AR at 679, 743. Tradesmen also

did not impose consequences when clients switched locations without notice. T-

AR at 680.

The majority finds Laborworks liable, in part, because the "citations

involved conditions that were within Laborworks' control" that concerned its

"failure to adequately *prepare* the workers for the work assignment." Majority at

12

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

25. But Tradesmen, too, had the responsibility to ensure the work site was suitable before sending workers there, and verifying this was within its control. The substantial difference I see is that Laborworks was on notice that workers had been previously injured by used needles at the site. Majority at 27 (although Laborworks "did not provide on-site supervision or daily control . . . it had notice of the prior incident and an opportunity to correct it"). WISHA does not require a worker to be injured before an enforcement action can be brought.

Under the economic realities test, staffing agencies like Laborworks and Tradesmen will generally qualify as employers.[5] But that does not mean that they will necessarily be liable for WISHA violations. *Potelco*, 191 Wn. App. at 34 (rejecting the employer's argument that it faced strict liability because the Department must prove actual or constructive knowledge). Tradesmen could limit liability by, for example, verifying that the worker is at the location they are sent to each day. Tradesmen could include clear language in its contracts requiring secondary employers to notify Tradesmen of work site moves, with consequences

---

[5] In fact, as of July 25, 2021, temporary staffing agencies appear to *always* be considered employers for WISHA purposes. LAWS OF 2021, ch. 37, § 1(7)(a) ("a 'staffing agency' is an employer as defined in this chapter."). This fits with the approach of OSHA's "Temporary Worker Initiative," where the agency treats most temporary agencies as joint employers. Nat'l Emp't Law Project, Dr. David Michaels, & Dr. Michael Silverstein's Br. of Amici Curiae in Supp. of Pet'r at 11. Staffing agencies "'share control over the workers, and are therefore jointly responsible.'" *Id*. at 12 (quoting Occupational Safety and Health Admin., Protecting Temporary Workers, *available at* https://www.osha.gov/temporaryworkers).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

if that is not followed.  Tradesmen already inspects work sites for safety violations, which is futile if clients move workers without providing notification and a new opportunity to inspect.  Just because an employer "'cannot [it]self abate a violative condition does not mean it is powerless to protect its employees.'" *D. Harris Masonry Contracting, Inc. v. Dole*, 876 F.2d 343, 345-46 (3d Cir. 1989) (quoting *Grossman Steel & Alum. Corp*. 4 BNA OSHC 1185, 1189 (No. 12775, 1976)) (explaining that an employer can "'attempt to have the general contractor correct the condition, attempt to persuade the employer responsible for the condition to correct it, instruct its employees to avoid the area where the hazard exists if this alternative is practical, or in some instances provide an alternative means of protection against the hazard.'" (quoting *Grossman Steel & Alum. Corp.*, 4 BNA OSHC at 1189)).

WISHA does not exempt temporary workers from its protections.  RCW 49.17.020.  Nor should our interpretation of WISHA.  *Erection Co.*, 160 Wn. App. at 202 (WISHA is "to be interpreted liberally" to provide "safe working conditions for *every* worker in Washington" (emphasis added) (citing *Inland Foundry Co. v. Dep't of Labor & Indus.*, 106 Wn. App. 333, 336, 24 P.3d 424 (2001))).  This is especially important because temporary workers in Washington experience twice the rate of injury as permanent workers.  Foley, *supra*, at 844.  Temporary workers are paid less for the same work—in Washington, they make 20-30% less than

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

permanent workers. *Id*. They are also less likely to receive benefits and are more likely to be people of color or immigrant workers. Laura Padin & Maya Pinto, *Lasting Solutions for America's Temporary Workers,* NAT'L EMP'T L. PROJECT 2, 5-6 (Aug. 26, 2019), https://www.nelp.org/publication/lasting-solutions-americas-temporary-workers/ [https://perma.cc/2WMA-AGMQ]. Temporary work has increased dramatically since 2009, especially in low-wage, labor-intensive sectors with high rates of worker injuries. *Id.* at 1; *see also* Michael Grabell, *The Expendables: How Temps Who Power Corporate Giants Are Getting Crushed*, PRO PUBLICA (June 27, 2013, 8:00 AM), https://www.propublica.org/article/the-expendables-how-the-temps-who-power-corporate-giants-are-getting-crushe [https://perma.cc/HY99-8L6Q]. Temporary workers are placed in hazardous jobs, have limited safety training, are more vulnerable to retaliation for reporting hazards, and are less likely to know how to report violations they experience. Foley, *supra*, at 841-42; Padin & Pinto, *supra*, at 5-6. Without holding staffing companies liable, the "approach creates a gap in protection for temporary workers because it puts the sole responsibility on hosting companies to comply with worksite-to-worksite rules." Pet. for Review (Laborworks) (No. 99032-8) at 2.

In these cases, as with many WISHA violations, the consequence of not providing safe working conditions can lead to serious injury or death. While Tradesmen's employee was not injured, they were working on a ramp without

15

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

guardrails and on nine-foot-tall, unstable, wooden scaffolding that could have collapsed.  T-AR at 707-08, 712, 758.  If he had fallen, "he could have fallen onto a concrete footing at the bottom of the excavation . . . it could possibly result in his death or permanent disability."  T-AR at 708.  The total penalty Tradesmen received was $12,600—a small sum compared to the death or permanent disability of an employee.  T-AR at 673-74.

In a joint employment context, while the secondary employer who controls a physical work site may be in a better position to abate some hazards, the staffing agency has a great deal of control.  The agency hires, pays, trains, disciplines, and fires its workers.  The agency, through its contracts, controls the terms of the placement.  Laborworks and Tradesmen had the right to inspect, and did inspect, the work site for safety violations, with the intent to take action if violations were found.  The agencies are able to protect its employees and should be required to do so.  I would reverse the Court of Appeals decisions for both Laborworks and Tradesmen.  Accordingly, I respectfully concur in part and dissent in part.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Dep't of Labor & Industries v. Tradesmen International, LLC*, No. 99031-0, consolidated with
*Dep't of Labor & Industries v. Laborworks Industrial Staffing Specialists, Inc.,* No. 99032-8
(González, C.J., Concurring/Dissenting)

González, C.J.

Gordon McCloud, J.

Yu, J.

Montoya-Lewis, J.

17